## 1883.  TOWALIGA FALLS POWER COMPANY *v.* SIMS.

1. A tenancy at will is an interest in land, and is capable of being damaged by the erection or maintenance of a nuisance.
2. Under the code of this State a nuisance is not, as at common law, essentially an injury to real property.   Any unlawful use of one's property whereby another is injured, whether the injury is to property, to business, to person, or otherwise, is an actionable nuisance.
3. Public or quasi-public corporations are, so far as they exercise legitimately and in a proper manner the powers expressly or by reasonable and necessary implication conferred on them, liable in damages only for taking or damaging property.
4. The properly doing of that which the law authorizes is not a nuisance.
5. The justification and exemption from ordinary liability afforded to public-service corporations by the law or their respective charters extend only so far as the authorization of the law extends.   If they act beyond the powers conferred by law or by the charter, they can not relieve themselves from the ordinary rules of damage by showing the public nature of the business carried on by them.
6. It is never to be presumed that the legislature intended to authorize a corporation to erect a nuisance materially tending to destroy the life or health of others.
7. Corporations engaged in the operation of plants for the generation and transmission of electricity for the purpose of lighting cities and towns,

operating railroads and street-cars, and furnishing light and power to the public, are public-service corporations, and are expressly recognized as such by the laws of this State. They possess the power to exercise the right of eminent domain. They may dam streams and back water over the lands of others upon payment of just compensation. But in the construction of dams and in the backing of water they must choose their sites with due regard to the surroundings. They are not authorized to maintain stagnant ponds, polluted pools of water, or places in which mosquitoes breed in unusual numbers, to the endangering of the health of surrounding communities.

8. There was testimony from which the jury might have found that the plaintiff had a spell of malarial fever as a result of being bitten by anopheles mosquitoes, bred in unusual numbers in stagnant water caused by the defendant's dam, but that the mosquitoes would have been incapable of communicating the disease if they had not previously bitten a person having malaria in his system. *Held*, that the court properly refused to charge the jury that under these circumstances the damages would be too remote to hold the defendant liable for damages.

9. Where the question is as to the cause of an attack of malarial fever suffered by the plaintiff, it is relevant for him to prove that the defendant erected a dam which caused the water to become stagnant and the mosquitoes to breed in unusual numbers, that previously there had been no malarial fever in the community, that the erection of the dam and the breeding of the unusual number of mosquitoes was followed by an epidemic of malarial fever, and that in the opinion of experts malarial fever is communicated by mosquitoes. The testimony was circumstantial, but of some probative value.

10. Prima facie any practicing physician is competent to testify as an expert as to the methods by which malarial fever may be communicated. His competency is not destroyed by reason of the fact that his views do not coincide with those generally held by the members of his profession and by other scientists. The weight to be given his testimony is for the jury.

11. When one is in possession of premises as a tenant, and another maintains a temporary nuisance whereby the premises are rendered unhealthful, and the tenant and dependent members of his household are made sick, the tenant may recover not only for the diminution caused to the value of his leasehold interest by the fact that the premises have become undesirable for habitation, but also for the direct damage caused him by the illness of himself and his family. His illness and that of the household is evidentiary on the question as to whether the premises have been rendered undesirable for habitation, and therefore of less rental value; but the pain and suffering, physician's bills, loss of time, etc., directly resulting from the illness, are elements of damage apart from the loss sustained in the shrinkage of the value of the property, and there may be a recovery of the damages from both sources when the pleadings and the evidence are such as to authorize it.

12. When the injury sued for consists in damage to the value of a tenancy at will, and to the plaintiff's person through illness suffered by himself, and to his purse through the loss of service of members of his family,

the plaintiff is not required to make proof of the loss with arithmetical accuracy in dollars and cents. He is entitled to recover for all actual damages, the extent of them to be estimated by the jury according to their enlightened consciences, from all the facts proved in the case.

13. No legal reason appears for reversing the judgment of the court below refusing a new trial.

Action for damages, from city court of Forsyth—Judge Clark. March 27, 1909.

Argued June 25,—Decided October 13, 1909.

*Cleveland & Goodrich, Persons & Persons,* for plaintiff in error.
*H. M. Fletcher,* contra.

POWELL, J. Sims sued the Towaliga Falls Power Company, alleging, that during the year 1906 he was a tenant residing on certain lands in Monroe county; that the defendant built a high dam across the Towaliga river, some distance below his residence, and backed a large body of water on and over a great area of land near his home; that the land so submerged was covered with trees and other vegetation; that the ponding of this water and the submerging of the vegetation caused malaria, and contaminated and affected the air with poisonous and deleterious gases; that the pond was a nuisance; that it made him and his family sick and caused them to lose a large amount of time and to incur expenses of medical treatment and nursing, and that he was deprived of the use of his premises. By amendment he set up that he himself, his wife and two minor children had been made sick of malarial fever; and the details of the sickness, lost time, and expenses incurred are set out definitely. By a further amendment he alleged, that the submerging of the vegetation had produced noxious, disagreeable, and poisonous odors, vapors, gases, etc., causing malaria and marsh gas to permeate, impregnate, and contaminate the atmosphere upon his premises, and that the pond had incubated, produced, and raised a great many mosquitoes, which infested his land and premises, from which he and his family suffered great annoyance; that his home was rendered uncomfortable, undesirable and at times almost uninhabitable; that his premises were rendered unhealthy and undesirable as a place to live; that great injury was caused to the land and to the enjoyment thereof and to the use of his home; that mosquitoes which were bred in the pond, and which had not previously infested it, became a medium for the transmission of malaria, and did transmit it to himself and his family, causing

them to have malarial fever, which they otherwise would not have had. He prayed for damages on account of the injury to the use of his premises, on account of his own sickness, pain, and suffering, on account of the loss of the services of his wife and minor children, and on account of expenses incurred in connection therewith.

On the trial the plaintiff introduced evidence tending to establish the allegations of his petition. The testimony of the defendant was to the effect that the pond was not stagnant; that there was less stagnant water, etc., in the neighborhood of the plaintiff's premises after the erection of the dam than there was before; that the pond did not cause his sickness; that if he was sick, he did not have malarial fever; that the mosquitoes about the pond were not of the anopheles (the malaria-bearing) kind; indeed there was enough expert testimony as to miasma, malaria, mosquitoes, bacteria, bacilli, microbes, germs, and other things in Greek, Latin, Italian, and sesquipedalian terminology to hopelessly confuse any jury; and as all this is copied without material abridgment into the brief of evidence, we ourselves are not without some justification if we decide this case without grasping all the points.

The trial resulted in a verdict in favor of the plaintiff, for $200; and the defendant, having filed a motion for a new trial, which was overruled, brings error. The record contains a large number of exceptions; we will not take them up seriatim, but will state certain general principles, applicable to the facts, and controlling upon the points presented.

1. The plaintiff's testimony showed that he was probably a tenant at will—that he was in possession by virtue of a parol contract for more than one year. A tenancy at will is an interest in land, and is capable of being damaged. See *Hayes* v. *Atlanta*, 1 *Ga. App.* 26 (57 S. E. 1087).

2. At common law a nuisance was regarded only as an injury to some interest in land. Blackstone's definition of a private nuisance is "anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another." The definition adopted in our code is broader: "A nuisance is anything that worketh hurt, inconvenience, or damage to another." Civil Code, § 3681. An examination of the authorities will show that

the modern tendency of the American courts is to break away from so much of the common-law rule as confined redress on account of nuisances to the damage done to some interest in real property, and as gave remedy only to persons having interests in lands. An interesting case on the subject is that of Ft. Worth & Rio Grande Ry. Co. v. Glenn, 97 Tex. 586 (80 S. W. 992, 104 Am. St. R. 894, 65 L. R. A. 818). It is hardly consistent with the modern idea of legal rights, wrongs, and remedies that a husband, living in a house the title to which is in his wife, should not have a cause of action against one who erects nearby a nuisance which sickens him and causes him other great losses; and yet some courts go to this extent. Under our code we think the rule is not so rigid, but that one who has been specially en-damaged by a nuisance can recover from the wrong-doer, though his damage consists in an injury to his purse or person, irre-spective of whether he has had an interest in real estate damaged or not.

3. The loss which occurs to a property owner from the erec-tion or operation of public or quasi-public utilities, such as roads, sewers, railroads, etc., upon his property, or in such range of it that damage ensues, is in many features so akin to the loss which occurs from the maintenance of a nuisance near him that there has been a tendency in the minds of the courts and text-book writers to confuse the two, and to apply measures of damage appropriate only in the one case to the other. Prior to the constitution of 1877 corporations exercising the right of emi-nent domain were liable only for the value of the property phys-ically taken by them, and not also for the consequential damage resulting to property not taken. City of Atlanta v. Green. 67 Ga. 386. Under the constitution of 1877 (art. 1, sec. 3, par. 1), "private property shall not be taken or damaged for public pur-poses without just and adequate compensation being first paid." Civil Code, §5729. The adoption of this provision enlarged the liability of those exercising the right of eminent domain and gave property owners a right to claim consequential damages, even though none of their property was physically taken. Smith v. Floyd County, 85 Ga. 420 (11 S. E. 850). But the constitu-tion makes provision for compensation only for the taking and damaging of property, and there is no provision as to the com-

48

pensation for damages to anything else resulting from a proper exercise of the right of eminent domain. In such cases, if business, purse, or person suffers, it is damnum absque injuria, unless the loss reflects itself in the diminution of the value of the tangible property. *Howard* v. *County of Bibb,* 127 *Ga.* 291 (56 S. E. 418). The result is that the measure of damages in cases when the injury ensues from the proper exercise of the right of eminent domain is very similar to that enforced in cases of injury from a nuisance in those jurisdictions where the common-law definition and notion of a nuisance is given full effect—"anything done to the hurt or annoyance of lands, tenements, or hereditaments of another." As stated above, our code recognizes a broader liability in nuisance cases. Hence, in this State, the measure of damage in the two cases is not necessarily the same.

4. The properly doing of that which the law itself expressly authorizes is not a nuisance, although it be the doing of that which, but for the justification of the law's authority, would be so. This principle is too universally recognized to require any citation of authority. It brings within the limitation of damages created by the constitutional rule as to the exercise of the right of eminent domain all cases in which the damages have resulted from the proper doing of that which is necessary or fairly incidental to the erection or operation of the public utility in the manner authorized by the law or charter, as the case may be. Therefore, if a public or quasi-public corporation, without negligence and in a proper manner does only the things necessary or fairly incidental to its authorized public business, and thereby injures another, the person so injured is without redress, except as to damages suffered in and through property or a property right; and in such cases the sole measure of damages is the actual loss (direct and consequential) sustained in the value of his property or property right.

5. The justification and exemption afforded by the law or the charter extends, however, only so far as the grant or authorization itself extends. Where the public necessity and convenience which is the basis for the grant of the right of eminent domain ceases to be a factor, the special immunity of the corporation ceases. Beyond that it stands as a private individual. To run trains is a public necessity or convenience; and when the law charters a

railroad company, the serving of the public in running the trains and the authorization of the law for that purpose prevent the running of trains from being a nuisance, though, in point of fact, even the prudent and proper operation of them may tend to injure and damage or annoy private persons; but the law does not permit freight-trains to be run on Sunday; hence, the running of them on Sunday may be a nuisance. *Georgia R. Co. v. Maddox,* 116 *Ga.* 64 (42 S. E. 315). An ordinary and necessary concomitant of the building of railroads is the erection of embankments and the construction of culverts; and therefore, in a general sense, the doing of these things is within the protections and immunities afforded by the charter; but there is a corollary that the charter contemplates that these things shall be done skilfully and in such a manner as not to endanger the health of persons in the vicinity. Therefore, to erect a culvert or embankment in such a manner that it ponds water and causes it to become stagnant and prolific of mosquitoes and dangerous to health is not within the actual or implied authority of its charter; and the railroad company, despite its ordinary immunity or limited liability, is in such cases held to full accountability for maintaining a nuisance. *G., F. & A. Ry. Co. v. Jernigan,* 128 *Ga.* 502 (57 S. E. 791); *S., F. & W. Ry. Co. v. Parish,* 117 *Ga.* 893 (45 S. E. 280); *Georgia R. Co. v. Bohler,* 98 *Ga.* 184 (26 S. E. 739); *Gilbert v. S. G. & N. A. Railroad,* 69 *Ga.* 396.

6. Indeed, it is never to be presumed that the law intended to authorize the operation of a thing which would seriously endanger the health and lives of its citizens. This is sometimes expressed, somewhat inaptly perhaps, by the statement that the law never authorizes a nuisance. The legislature can authorize things to be done which, more or less, interfere with many of the rights enjoyed by the public in common, and which in a sense tend to annoy and, even in a financial way, to damage private individuals; and such things so authorized are not nuisances; but it is extremely doubtful if the legislature has the power to authorize the doing of a thing which in its nature would tend to destroy or to impair materially the morals, the health, or the safety of the people. See paragraph 2 of section 2 of article 4 of the constitution (Civil Code, §5798). The right of private convenience, the right of the private citizen to hold and own any

particular property, must yield to public convenience and public service, whenever and wherever the legislature says yield; and to this extent the right of eminent domain is paramount; but private life and private health are more precious in the eyes of the law than even public convenience.   Generally upon the subject of legalizing nuisances, see Wood on Nuisances, c. 23.

7.   Now coming nearer to the present case:   The furnishing of electricity to the public, for the purpose of lighting towns and cities and operating railroads and street cars and supplying light and heat to the public, is a public utility.   The legislature, in recognition of this fact, has conferred the right of eminent domain on corporations engaged in this business, and has authorized them to condemn rights of way and other easements over lands, and to erect dams, and to back water upon the lands of others, upon payment of just compensation.   Such inconveniences and annoyances to private persons as arise as a natural and probable result of these acts so authorized are covered in legal contemplation by the legislative grant, and are not nuisances.   But "the rule is that where a corporation or an individual is authorized to do an act which is in derogation of private rights, it is bound to exercise the power given with moderation and discretion, and not negligently."   Wood on Nuisances (3d ed.), §754.   It will not be presumed that the legislature intended that the dams should be constructed in such places or in such manner as to endanger the general health of the citizens of the community.   As was said by Crompton, J., in the case of The Queen *v.* Bradford Navigation Co., 6 Best & Smith, 649, in which the defendant had been authorized to make dams and collect water for the operation of a canal:   "Here the company are authorized to take the water of becks and make a canal; but that does not involve their bringing feculent matter and allowing it to accumulate in their canal so as to be a nuisance."   In the same case Blackburn, J., said: "Assuming that the defendants take the water under the direction of the legislature [i. e., the Parliament, the power of which as to the authorization of acts which otherwise would be a nuisance is probably broader than that of the legislature of this State], these acts are only permissive; the defendants are not authorized or enjoined to take water in such a state as to make the canal a nuisance.   Inconvenience to the public and to the company may

be occasioned if, from the want of pure water, the supply of water in the canal runs short; but that can afford no justification for the defendants' creating a nuisance.   It throws on them the necessity of taking the necessary steps to compel the local board of health to do their duty in cleaning the beck, or, if that be found an inefficient remedy, to obtain a private act of Parliament for the purpose."

In a State like ours, with its many undeveloped resources, with its hundreds of streams running from the hills to the sea and wasting on their way a wealth of energy which ought to be harnessed with machinery and made to serve the public good, it would be contrary to the very purpose for which the State itself was organized to allow mere reluctance of property owners to part with their ownership, or a small amount of private annoyance and inconvenience, to stand in the way of development.   On the other hand, the public health is more important than the public convenience.   If the energy of the stream can not be converted into the electric current without damming the water in such a manner as to allow it to become stagnant and polluted, so as to make it a menace to life and health, the enterprise is not permissible. From this it follows that these water-power companies must choose their sites with due respect to the surroundings.   If the contour of the country is such that the ponding causes the water to collect in lagoons and low places, and to become stagnant and infested with disease-bearing mosquitoes, some remedy must be devised for the protection of the health of those who live within range of the evil.   If some small amount of stagnant water is necessary, and if, as a result of this stagnant water, it is dangerous to life and health for persons to occupy the lands adjacent, the corporation has no right to say that the persons must, at their own loss, desert their homes or other places where they have a right to be; the corporation must find a remedy or must acquire by purchase or condemnation the lands lying within range of the noxious places, and in this way confine the harm to their own property.   The legislature has not granted away the right of the people to be secure in their lives and health.

For illustrative cases where the Supreme Court of this State has held public or quasi-public corporations liable in damages to private persons for injury to health through the creation of

stagnant ponds or pools, or the maintenance of places favorable to the excessive breeding of mosquitoes, see *Georgia, Fla. & Ala. Ry. Co.* v. *Jernigan,* supra; *S., F. & W. Ry. Co.* v. *Parish,* supra; *Langley* v. *Augusta,* 118 *Ga.* 598 (45 S. E. 486, 98 Am. St. R. 133); *Smith* v. *Atlanta,* 75 *Ga.* 110; *City of Atlanta* v. *Word,* 78 *Ga.* 276; *City of Atlanta* v. *Warnock,* 91 *Ga.* 210 (18 S. E. 135, 23 L. R. A. 301, 44 Am. St. R. 17); *Holmes* v. *Atlanta,* 113 *Ga.* 961 (39 S. E. 458); *Mayor of Waycross* v. *Houk,* 113 *Ga.* 963 (39 S. E. 577); *Butler* v. *Thomasville,* 74 *Ga.* 570. The above citation of cases is by no means exhaustive.

8. One of the contentions of the plaintiff in error is that if, as the testimony of the expert witnesses strongly indicated, the malarial fever with which the plaintiff and his family, according to his testimony, suffered was produced in them by the bite of a particular kind of mosquito which was harmless and incapable of carrying the disease unless it had first bitten some other human being already infected with malaria, the relation between the maintenance of the pond, even though it afforded a place for the breeding of the mosquitoes, and the final communication of the disease to the plaintiff was too remote. Counsel ingeniously and, we suspect, somewhat facetiously, argue that the mosquito is an animal feræ naturæ, and that in an action for damages done by a dangerous animal, scienter on the part of the person harboring it is a necessary allegation; citing *Cox* v. *Murphey,* 82 *Ga.* 623 (9 S. E. 604), and *Clarendon* v. *McClelland,* 89 Tex. 483 (31 L. R. A. 669, 59 Am. St. R. 70, 34 S. W. 98, 35 S. W. 474). Without making any specific classification of mosquitoes, we hold that they are a common pest, and that the maintenance of a place where they breed in unusual numbers is such a menace to persons residing nearby as to make that place ordinarily a nuisance; and that if, as a result of the maintenance of such a place, the mosquitoes do in fact breed there, as they otherwise would not have bred, and become inoculated with malaria, and, in accordance with what is naturally to be expected, fly abroad and communicate malarial fevers, the proprietor of the breeding place is, in legal contemplation, proximately the author of the damage.

9. Testimony that prior to the creation of the pond there were but few mosquitoes and no cases of malarial fever in the

community; that the pond had stagnant pools in it favorable to the breeding of mosquitoes; that following its creation the mosquitoes appeared in unusual numbers, and an epidemic of malarial fever broke out in the community, would, in connection with expert testimony that malaria is conveyed by mosquitoes, be relevant circumstantial evidence on the question as to whether the creation of the pond caused the epidemic of fever. The range of such testimony, like that in cases of experiments, is largely within the discretion of the trial judge. Hunt *v.* Lowell Gas Co., 8 Allen, 169 (85 Am. Dec. 697).

10. Prima facie, any practicing physician is, by virtue of his profession, an expert on the methods by which diseases are communicated. In order to qualify one as an expert witness, it is not necessary that he or any one else should testify in hæc verbis that he is an expert, but the fact that he is entitled to give expert testimony may be shown by a statement of his profession, occupation, education, and experience. The extent of the witness's knowledge or opportunities for accurate information on the subject may be shown either by the direct or the cross examination. The weight to be given his testimony is for the jury. A practicing physician who has treated a case of malarial fever and who is acquainted with surrounding conditions is competent to express an opinion as an expert upon the causes of the fever, although his general ideas on the question may be out of harmony with those entertained by his profession generally and by the majority of scientific men.

11. Recurring now to the measure of damages: The theory of the plaintiff's case was not that the defendant had damaged him in the legitimate execution of any of its powers as a public service corporation, but that if it possessed those powers, it had exceeded them, and had created a nuisance in law and in fact. In passing, it may be said that it did not appear that the defendant was engaged in the business of supplying the public with electricity, though that was one of its charter powers. So far as the evidence discloses, it may have erected and have used the dam for a purely private purpose; for this, too, was included within the provisions of the charter, a copy of which is in the record. In any event, the gist of this action is the maintenance of a thing menacing to health, and, as we have said above, the

public nature of the defendant's calling would not shield it from liability on account of the maintenance of a nuisance in fact seriously endangering the health of those living nearby. The defendant, if liable at all, was therefore liable for all actual damages, whether done to property or not. The basis for limiting its responsibility to damages to property only was not present under the theory of the plaintiff's case.

Now, where the effect of a nuisance is to make the residence of a person unhealthful, the market value of the property, or of some interest therein, suffers. If the property is in the possession of a tenant, and the nuisance is of such a temporary nature as not to be likely to affect the premises after the expiration of the lease, the whole loss is to the tenant's leasehold interest, and not also to the landlord's reversion. The evidence in this case did not disclose more than a temporary nuisance. Where a temporary nuisance makes the premises undesirable by reason of the likelihood of those living there to be made sick, the property suffers a natural· diminution in rental value for the time being, and if the premises be held by a tenant, the value of the leasehold interest is the thing affected; and, by examining the matter critically, it may be seen that this damage results not so much because of the actual occurrence of the illness, but because of its liability to occur. The damage to the market value of the lease is just as great where the tenant has to move out on account of a reasonable fear of illness, as it is where he remains and he or his family actually becomes sick. The ensuing illness, where it does occur, the seriousness of it, the generality with which it is suffered by the family or other occupants of the premises. is evidentiary of damage to the real estate, but is not part of that damage. In those cases where, from the nature of the subject-matter or the state of the pleadings, only damages to property are recoverable, proof of illness suffered by the occupants of the premises may be heard for the purpose of showing how much the particular interest in the realty has been damaged; but except in so far as it reflects itself in diminution of the value of the property, the damage directly resulting from the illness itself can not enter into the recovery. But where the plaintiff is entitled to recover all the direct damages resulting to him from the nuisance, the rule is different. In the latter class of cases the person injured

may sue for and recover not only any loss occasioned to his interest in the realty by reason of the premises being rendered undesirable through their unhealthful condition, but if he has suffered illness, he may recover separate and additional damages for that. As to illness suffered by himself personally, the plaintiff may claim damages for pain and suffering, physicians', druggists', and nurses' bills, and for loss of time from his usual labor. As to illness suffered by those members of his family for whose support and maintenance he is legally liable and to whose services he is entitled, he may recover in like manner, except as to the element of pain and suffering. The present plaintiff was the owner of a crop; he sought to recover damages not only for the time he lost from the crop through illness, but also for the amount he paid to hands hired by him to take his place in the crop. This would have been a reduplication of the damage, and therefore not permissible. He also claimed to have lost a portion of his crop because he could not harvest it, on account of the time he lost from sickness. He could not recover both of these. · If he could have hired hands and have saved the crop, he should have done this, and the measure of damage would have been the sums expended in paying the hired men.

A close reading of the case of *Swift* v. *Broyles,* 115 *Ga.* 885 (42 S. E. 277, 58 L. R. A. 390), and especially of the summary of the pleadings given prefatory to the opinion, will show that what we have said above is in harmony with the decision in that case. In many States following the common law the measure is narrower, but in this State, as the Supreme Court ·said in the case of *Langley* v. *Augusta,* supra, "The plaintiff is, however, entitled to recover for all legitimate damages of every kind he has sustained. He can recover for the increased expense to which he has been put in the building of bridges, etc., by reason of the construction and maintenance of the ditch. He can recover whatever actual damages he has sustained by reason of sickness, or by reason of injury to his property, growing out of the maintenance of the ditch in such a way as to make the same a nuisance. In a word, the plaintiff can recover all the actual damages he has sustained by reason of the wrong complained of, on the theory that the ditch as maintained is a nuisance." In *Savannah Ry. Co.* v. *Parish,* supra, the plaintiff sued for $1,000 damages to the market

value of his property, and for $1,000 additional damages on account of his having been made ill as a result of the nuisance; the verdict was for the full amount of $2,000, and this was sustained by the Supreme Court. In *G., F. & A. Ry. Co.* v. *Jernigan,* supra, though only $200 damages to property was alleged, a verdict of $400 was sustained, there having been an allegation that the plaintiff was further damaged by the sickness of himself and family. See also *Jones* v. *Royster Guano Co.,* ante, 506 (65 S. E. 361).

12. Since the damages incurred by the plaintiff, under his pleadings and testimony, consisted of an injury to the value of a tenancy at will, to his person through˙ sickness, and to his purse through loss of services of his wife and minor children, it was not necessary that he should submit figures in dollars and cents, so as to show his loss with arithmetical accuracy. As to such matters the enlightened conscience of the jury is the guide. The court properly instructed the jury, in substance, that the plaintiff was entitled to recover for the actual damages inflicted by the injury, and that they should estimate the amount by their enlightened consciences from the facts submitted. *Hayes* v. *Atlanta,* supra; *Jones* v. *Royster Guano Co.,* supra; Baltimore & Potomac R. Co. *v.* Fifth Baptist Church, 108 U. S. 362 (2 Sup. Ct. 719, 27 L. ed. 746).

13. We have given the record much careful consideration. The result of our study is that while we gravely doubt that the jury reached the right result, we find no reversible error in the record; and the jurors, and not we, of course, are the sole judges of the facts. The charge of the court was eminently. fair, and followed in general outline the opinion given above. It is our duty, therefore, to affirm the judgment refusing a new trial.

*Judgment affirmed.*