Justice LEE,
concurring in the judgment:
(17 I concur in the majority's decision reversing the grant of summary judgment in favor of the State, but write separately to offer an alternative understanding of the statutory construct of a "natural condition on [the] land" under Utah Code section 68G-7-301(5)(k). Thus, I agree that the Jordanelle Reservoir is not a "natural condition on [the] land[ ]" for which the government is immune. But I find the court's conception of that statutory construct-initiated in prior cases and extended in the majority opinion today-to be unworkable and insufficiently connected to the text of the statute. In this opinion I propose an alternative approach rooted in a term-of-art conception of "natural condition" from premises liability in tort law. The goal is to preserve the results of our prior cases while providing workable guidance going forward.
{18 The statutory construct of a "natural condition on [the] land[ ]" has bedeviled our court for years. We have appropriately noted that a broad, literal interpretation of "natural condition" would encompass "laws of physics, such as gravity, that necessarily contribute to any accident or occurrence." Grappendorf v. Pleasant Grove City, 2007 *958 UT 84, ¶ 11, 173 P.3d 166. And we have rightly worried that an undue extension of the natural condition exception could "swallow" the statute's "waiver of immunity for negligence." Id.; See also Francis v. State, 2013 UT 65, ¶ 45, 321 P.3d 1089 (expressing the need for "caution" in interpreting this "inexact term" in a manner that "could be stretched to include almost anything").
19 As I have noted previously, this problem is magnified by our court's commitment to a but-for test of causation-a test that allows any incidental connection to the natural condition exception (or to any of a number of other immunity-invoking exceptions) to override the statute's waiver of immunity for acts of negligence and the like. See Thayer v. Wash. Cnty. Sch. Dist., 2012 UT 31, ¶¶ 52-66, 285 P.3d 1142 (Lee, J., dissenting) (criticizing the "some causal relationship" formulation in the caselaw). That standard is problematic. It is incompatible with the structure of the Governmental Immunity Act, which first broadly waives immunity for injuries caused by nonimmune acts (such as negligence), see Urax Cop® § 68G-7-301(1)-(4), and then reinstates immunity in instance-es where the injury actually arises from other enumerated acts or occurrences (such as conditions on the land), id. § 63G-T-801(5). By broadly treating a natural condition with any "causal nexus" to an injury as a basis for an exception triggering governmental immunity, our cases enhance the problem of a broad "natural condition" immunity swallowing the government's waiver for its acts of negligence.
T20 Our "natural condition" cases have gone to some lengths to navigate around these rocky problems. First, in Blackner v. State, we conceptualized an avalanche as a "natural condition" sustaining immunity and held that immunity attached despite the plaintiffs' argument that the proximate cause of the injury was the government defendants' negligence in stopping traffic in a manner that put the plaintiffs at risk of harm from the avalanche. 2002 UT 44, ¶¶ 13-16, 48 P.3d 949. Then, in Grappendorf, we acknowledged that a gust of wind was in some sense "natural," but nonetheless declined to extend immunity to an accident caused when wind interacted with an artificial pitcher's mound at a baseball park, suggesting that a "transient" force of nature does not "exist on the land as required by the plain language of the statute." 2007 UT 84, ¶ 10, 173 P.3d 166. And in so doing, we emphasized the need to "avoid an interpretation that nullifies the Act's waiver of immunity." Id. 111. Most recently, in Francis v. State, we applied the Grappendorf analysis in a manner foreclosing immunity for injury caused by an attack by a wild bear, concluding that the bear was too "transitory" to be considered a natural condition on the land. 2018 UT 65, " 42, 821 P.3d 1089. In Francis, we sought to distinguish "topographical" features like rivers, lakes, and trees, which were "directly a part of and persist 'on the land'" from wild animals not as "closely tied to the land." Id.
1 21 These decisions seem commendable as an exercise in furtherance of the goal of preserving a role for the "natural condition" exception that does not swallow the waiver of immunity for government negligence. But to me they appear to be more of an ad hoe effort to secure fair outcomes than an attempt to announce a consistent understanding of the statutory text. Indeed, the analysis of the exception as applied in this case seems to me to emphasize that point.
122 The majority reverses the court of appeals for its simplistic treatment of the question whether the waters of the Jorda-nelle are "natural," finding error in the assertion that water emanating from the Provo River is always and forever a "natural condition." Supra 119, 11. Yet, the court's analysis is equally simplistic. The majority is right to conclude that "[wlere it not for human efforts in building the Jordanelle Dam, the Jordanelle Reservoir would not exist and in its place would remain the naturally flowing Provo River." Supro T 14. But that is only to say that a nonnatural condition was essential to the current existence of the Jor-danelle Reservoir. And the same can be said of a natural condition: Were it not for the naturally flowing Provo River, the Jordanelle Reservoir would not exist and in its place would be a barren valley.
4 23 The point is that the question whether the waters of the Jordanelle are natural or *959 nonnatural is not a matter for abstract logic. It is a matter for statutory interpretation-for a determination whether the terms of our statute give controlling significance to a natural condition (naturally flowing waters) or a nonnatural condition (a dam) when both come together to create a condition essential to a danger contributing to an injury.
{24 To address this question, we must do more than espouse the need to avoid an overbroad, rule-swallowing exception for natural conditions. (After all, the converse concern is also there-of avoiding an understated, meaningless formulation of natural conditions that would deprive it of any meaningful application.) We must give substantive content to the text of the statute, in a manner that will allow both litigants and lower courts to apply it in a predictable manner.
125 The question, then, is whether the statutory notion of a "natural condition on [the] land{ 1" encompasses conditions that are formed by the confluence of both natural and man-made elements. I would answer that question on the basis of a reconsideration of the meaning of those terms. And in so doing, I would look to the common-law background of the operative terms of the Governmental Immunity Act-to terms rooted in established common-law terminology since before the adoption of that statute.
126 The key statutory provisions seem to me to incorporate classic terms of art from premises liability in the law of tort. Thus, the statute waives immunity for any injury caused by "a defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located on them" (unless such condition is "latent"), and for any injury caused by "any defective or dangerous condition of a public building, strue-ture, dam, reservoir, or other public improvement" (but with another caveat for "latent" conditions). Utah Code § 63G-T-801(8). The exception at issue here is a counterpart to these provisions, reinstating immunity for an injury that arises out of "any natural condition on publicly owned or controlled lands." Id. § 63G-7-301(5)(k).
127 The references to "dangerous conditions," "latent conditions," and "natural conditions" are apparent invocations of terms of art from premises liability in the law of tort. Under firmly rooted principles of premises liability, a possessor of property may be liable to an invitee or licensee if he fails to exercise reasonable care necessary to protect them from a known "dangerous condition" on the land. RestatemEnt (SEconp) or Torts § 343 (1965); Tallman v. City of Hurricane, 1999 UT 55, ¶ 9, 985 P.2d 892 ("The creator of an artificial condition on land may be liable to others-both upon or outside of the land-for physical harm caused by its dangerous nature."); Rogalski v. Phillips Petroleum Co., 3 Utah 2d 203, 282 P.2d 304, 307 (1955) ("'The duty owed by an owner of land to a business visitor is to inspect and maintain his premises in a reasonably safe condition or to warn the visitor of any dangerous conditions existing thereon."); Erickson v. Walgreen Drug Co., 120 Utah 31, 232 P.2d 210, 212 (1951) (citing and adopting the Restatement standard). This principle is also reflected in the law of nuisance, which subjects a possessor of land to liability for "abatable artificial condition{s] on the land" if the possessor knows of the condition, knows or should know that it exists without the consent of those affected by it, and fails to take reasonable steps to abate it. REstaTEMENT (SEC-onp) or Torts §$ 889 (1979); Finkelstein v. Huner, 77 AD. 424, 426-27, 79 N.Y.S. 334 (N.Y.App.Div.1902) (upholding damages based on failure to abate the danger from the artificial condition of a privy and cesspool); Rose v. Standard Oil Co. of New York, 56 R.I. 272, 185 A. 251 (1936) (leaking oil and gas from a refinery is actionable as nuisance).
128 The reference to "natural conditions on [the] land[ ]" is also borrowed from the tort law of premises liability. Under longstanding principles of tort law, a possessor of land is not "liable for physical harm caused to others outside of the land by a natural condition of the land." RestatEmEnt (SEc onp) of Torts § 868(1) (1965); McCarthy v. Ference, 358 Pa. 485, 58 A.2d 49, 58 (1948) ("[GJenerally speaking, ... a landowner is not subject to liability for bodily harm caused to others outside the land by a natural condi *960 tion of the land...."). And this principle again is also reflected in the law of nuisance. Nuisance law provides that "a possessor of land is not liable to persons outside the land for a nuisance resulting solely from a natural condition of the land," RestatEmEnt (Src onD) or Torts § 840(1) (1979),[1] while defining "natural condition" as "a condition that is not in any way the result of human activity." Id. cmt. a; Livezey v. Schmidt, 96 Ky. 441, 29 S.W. 25, 25 (1895) ("Als expressed in textbooks, in order to create a legal nuisance, the act of man must have contributed to its existence." (internal quotation marks omitted)); Salmon v. Delaware, L. & W.R. Co., 38 N.J.L. 5, 11 (N.J.1875) (natural conditions are those that are "purely sequences of natural causes"); Roberts v. Harrison, 101 Ga. 773, 28 S.E. 995, 996 (1897) (natural conditions are "due solely to natural causes").
129 These constructs are well-rooted in settled caselaw established long before the date of the enactment of our Governmental Immunity Act. And because the terms of the statute are an apparent adoption of settled legal terms, I would construe the statutory terminology to embrace the term-of-art understanding embedded in these words.
180 A "word or phrase" that "is 'transplanted from another legal source, whether the common law or other legislation" is understood to " 'bring[ ] the old soil with it.'" Maxfield v. Herbert, 2012 UT 44, ¶ 31, 284 P.3d 647 (quoting Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Conum. L.Rev. 527, 537 (1947)). That seems clearly to be the case here. It can be no accident that the relevant, operative terms of the Governmental Immunity Act-those addressed to the government's immunity as regards its role as possessor of land or other property-coincide with the key terms that have long been used to define the scope of premises liability in tort.
4 31 Thus, I would read the statute's reinstatement of immunity for injury arising out of a "natural condition on [the] land[ |" as a transplant from premises liability in tort law. And I would interpret that term in a manner incorporating the "old soil" that it has long carried at common law.
132 That understanding is not only faithful to the text of the statute; it also addresses the above-noted concern for avoiding an overly expansive interpretation of the natural condition exeeption. And it is also compatible with the results of our cases.
4 33 The longstanding common law concept of "natural conditions" is straightforward. It defines a "natural condition" as a "condition of land [that] has not been changed by any act of a human being." Restatemznt (Seo or Torts § 368, emt. b. It also contrasts natural conditions with artificial ones, which are defined as "structure[s] erected upon land" and "trees or plants planted or preserved, and changes in the surface by excavation or filling, irrespective of whether they are harmful in themselves or become so only because of the subsequent operation of natural forces." Id. § 868 emt. b; Mills v. Hall & Richards, 9 Wend. 815, 816 (N.Y.Sup.Ct. 1832) (pond created by man-made dam was an artificial condition); Towaliga Falls Power Co. v. Sims, 6 Ga.App. 749, 65 S.E. 844, 846-49 (1909) (pond created by artificial dam and attendant mosquitoes); McCarthy, 58 A.2d at 50-58 (rockslide on natural hill that was weakened by the construction of a highway); Andrews v. Andrews, 242 N.C. 382, 88 S.E.2d 88 (1955) (wild geese attracted by bait and a man-made pond). Thus, as conceptualized in the Restatement (Second) of Torts, a natural condition:
comprehends soil that has not been cultivated, graded or otherwise disturbed; water that is on the land wholly through natural causes; trees, weeds and other vegetation on land that has not been made artificially receptive to it by act of man; and birds, animals or insects that have not been brought upon it or attracted by act of man. The term does not comprehend con *961 ditions that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the subsequent operation of natural forces.
REestatEmEnNt (SEconp) or Torts $ 840 emt. a.
T34 This standard incorporates a natural brake against the concern about the "natural condition" exception swallowing the statutory waiver of immunity for negligence and other acts and conditions. See Grappendorf, 2007 UT 84, ¶ 11, 173 P.3d 166; Francis, 2013 UT 65, ¶ 45, 321 P.3d 1089. It clarifies that immunity for natural conditions does not extend to "conditions that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the subsequent operation of natural forces." Restatement (SEconp) or Torts § 840 emt. a.
1 35 That proviso avoids the rule-swallowing effect of the notion that a literal interpretation of "natural condition" would encompass "laws of physics, such as gravity, that necessarily contribute to any accident or occurrence." Grappendorf, 2007 UT 84, ¶ 11, 173 P.3d 166. It does so by indicating that immunity is not invoked for "conditions that would not have arisen but for the effect of human activity," a caveat that forecloses immunity for injuries traceable to "laws of physics" through their interaction with artificial elements.
' 36 The common law formulation of "natural condition" also preserves the results of our prior cases. Under the tort law formulation, an avalanche is a condition that "has not been changed by any act of a human being." Restatement (Second) or Torts § 863 emt. b. It is essentially "water that is on the land wholly through natural causes," and by no means a "condition[] that would not have arisen but for the effect of human activity." Id. § 840 emt. a. The common-law, term-of-art understanding of the natural condition exception is accordingly consistent with the result in Blackner, which extended the exception to confer immunity as to claims arising out of an avalanche. Grappendorf is also sustainable under this approach, as a pitcher's mound propelled by a gust of wind is a condition "that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the operation of natural forces." Id.; Grappendorf, 2007 UT 84, 173 P.3d 166.
187 The Francis case might seem a bit more difficult to sustain under the common law understanding of natural conditions, since the above formulation expressly encompasses "birds, animals or insects that have not been brought upon [the land] or attracted by act of man." RestaremEnNtr (SEconD) oF Torts § 840 emt. a. But although "black bears are native to Utah," there was evidence in Francis that the State defendants had been aware that the bear at issue "had found food" at the campground in question and "would likely return if attracted" by humans or food. 2013 UT 65, 118, 11, 821 P.3d 1089. So there arguably was a material dispute in Francis as to whether the bear had been "attracted by act of man." And if so the result in Francis-reversal by our court of a summary judgment decision in favor of government defendants on "natural condition" immunity grounds-could also be sustained. See also Maynard v. Carey Constr. Co., 302 Mass. 530, 19 N.E.2d 304 (1939) (infestation of cockroaches attracted to a dump).
188 I would apply this standard to this case. Thus, I would interpret the statutory exception for "natural condition{s] on [the] land[ ]" to extend only to conditions that have "not been changed by any act of a human being," REstatEmENtT (SEconp) or Torts § 863 emt. b, or in other words not to "comprehend conditions that would not have arisen but for the effect of human activity." Id. § 840 emt. a. And because the Jordanelle Reservoir is a condition affected substantially by human activity (the construction of the Jordanelle Dam), I would hold that the reservoir is not a natural condition and thus that immunity is not reinstated under the statuto *962 ry exception in Utah Code section 63G-7-801(5)(k).
139 This common law, term-of-art understanding of "natural conditions] on [the] land[ J" incorporates its own inherent standard of causation.[2] It tells us, by reference to common-law principles of premises liability, that any human or artificial element that interacts with a natural condition in a material way transforms the previously natural condition into an artificial one. And it therefore also preserves independent meaning for both the statutory proviso that immunity is generally waived for injuries caused by defective or dangerous (and nonlatent) conditions of "reservoirs," Utah Code § 68G-T-301(8)(a)(ii) & (b)), and for the statutory exception reinstating waiver (even as to injuries caused by defective or dangerous conditions of reservoirs) if the injury arises out of "any natural condition on [the] land[ ]," id. § 63G-T-8301(5)(k).
140 The term-of-art understanding of "natural conditions" allows us to make sense of both the general waiver for dangerous, nonlatent conditions of reservoirs and the specific exception for natural conditions. It does so by crediting the general waiver in cireumstances in which a natural condition (such as water flowing in a river) interacts with an artificial condition (such as a dam)rendering the otherwise natural water an artificial "dangerous condition" (a reservoir). And the implication for the exception reinstating immunity for "natural conditions" is parallel: Where the injury results only from a natural condition, and not at all from any interaction with an artificial element, then immunity is reinstated even for injuries generally (in a but-for sense) connected to a dangerous artificial condition like a reservoir.
141 That construct triggers the statutory waiver of immunity for the injuries at issue in this case, which were allegedly caused by the dangerous, artificial condition of the Jor-danelle Reservoir in a manner not implicating the statutory exception for natural conditions. That is because all of the allegations of negligence in this case are closely connected in a material way to interactions between natural and artificial elements. See supra 1 5. Thus, although Glaittli's injuries were a result of natural conditions of wind and weather, the harm he suffered arose out of interactions of those elements with the artificial condition of the Jordanelle Reservoir as waves are not caused by wind alone but by the interaction with a large body of artificial water-a "condition[ ] that would not have arisen but for the effect of human activity," ResratemEnt (SEconp) or Torts § 840 emt. a.[3]
1 42 I would reverse the court of appeals on that basis. And in so doing I would repudiate our ad hoe conception of the natural condition exception and replace it with a framework rooted in the common-law, term-of-art understanding of the statutory terminology. I concur in the judgment of the court on that basis.

. Salmon v. Delaware, L. & W.R. Co., 38 N.J.L. 5 (N.J.1875) (dead leaves and dry grass that caught on fire not a nuisance); Roberts v. Harrison, 101 Ga. 773, 28 S.E. 995, 996 (1897) (stagnant pond emitting noxious gases not a nuisance as "(ill results, however extensive or serious, that flow from natural causes, cannot become a nuisance"); Harndon v. Stultz, 124 Iowa 734, 100 N.W. 851 (1904) (noxious weeds spread to neighboring property by action of wind not a nuisance); Langer v. Goode, 21 N.D. 462, 131 N.W. 258 (1911) (same).

. For that reason, I would not reach the broader question of the general viability of our "some causal nexus" standard of causation for exceptions to waivers of immunity. See supra 119. But I would flag the question as meriting careful reconsideration in a future case. See Thayer, 2012 UT 31, 129-69, 285 P.3d 1142 (Lee, J., dissenting). In my view, the court should inquire as to whether the natural condition was not only the actual cause of the injury, but the legal or proximate cause as well, as viewed through traditional tort principles. I see this approach as mandated by the text and structure of the Act.

. A contrary conclusion might well obtain if, for example, Glaittli had been struck by lightning while perched on the dock at Jordanelle. In that event, perhaps it could be said that his injury was not at all a result of an interaction between natural conditions (weather) and artificial ones (the reservoir), since it could not be said that a lightning strike is a "condition[ ] that would not have arisen but for the effect of human activity." RestatemEnt (Seconp) or Torts § 840 cmt. a. At a minimum, such a question might be one for a jury, and the possibility of this conclusion preserves application for both the subsection (3) proviso that immunity is waived for dangerous, nonlatent conditions of reservoirs and for the subsection (5) exception that immunity may still be reinstated if an injury results from a natural condition.