MONTGOMERY LIGHT & WATER POWER CO. v. CHARLES et al.

(District Court, M. D. Alabama, N. D. at Montgomery. July 15, 1919.)

No. 233.

1. INJUNCTION ☞26(4)—MULTIPLICITY OF SUITS—EQUITABLE RELIEF.

Where some 130 landowners, whose premises had been flooded, instituted separate actions for damages against owner of a dam, the federal District Court, to which all the suits of jurisdictional amount had been removed, has equity jurisdiction to restrain the prosecution of the suits at law, where the plaintiffs at law are united by a common tie created by identity of interest in the decision of the same questions of law and fact, the party defendant is the common adversary, and the suits are so numerous that their further prosecution would visit great inconvenience,

---

hardship, and expense upon the defendant in the actions at law. Motion to dismiss for want of equity overruled.

2. WATERS AND WATER COURSES ☞179(4)—DAMS—FLOODS—SUFFICIENCY OF EVIDENCE.

Evidence that water of defendant's dam rose 10 feet following a 10-inch rainstorm, that plaintiffs' lands were annually flooded, that tributary streams entered river between dam and plaintiffs' lands, etc., *held* not to establish that flooding of plaintiffs' lands was caused by defendant's maintenance of 3-foot flash board on its dam, which impounded a comparatively small quantity of water.

3. WATERS AND WATER COURSES ☞179(2)—DAMS—RECOVERY OF DAMAGES.

Landowners, seeking to recover damages caused by flood from a dam owner, must show that dam owner's negligence proximately caused the injury.

4. NEGLIGENCE ☞56(1)—PROXIMATE CAUSE.

To constitute actionable negligence, the causal connection between the negligence and the injury must be by natural and unbroken sequence, without intervening causes.

In Equity. Bill by the Montgomery Light & Water Power Company against T. T. Charles and others. Order for permanent injunction.

Steiner, Crum & Weil, of Montgomery, Ala., Frueauff, Robinson & Sloan, of New York City, and J. M. Holley, of Wetumpka, Ala., for plaintiff.

Rushton, Williams & Crenshaw, Hill, Hill, Whiting & Thomas, and W. A. Jordan, all of Montgomery, Ala., for defendants.

HENRY D. CLAYTON, District Judge. About the year 1900 the plaintiff, the Montgomery Light & Water Power Company, a New Jersey corporation, constructed and has since owned and operated a dam and an electro-hydraulic plant on the Tallapoosa river about 3 miles above the town of Tallassee, Ala., and has been and is now engaged in generating and selling electric power to the public generally at Montgomery and in that vicinity for lighting and industrial purposes.

In the year 1917 the defendants in this case owned or operated the lands situated along the river and below the dam as farms. On August 7 of that year the river overflowed its banks, and the crops growing on these lands were inundated and destroyed. Soon thereafter such farmers who are defendants here, some 130, hereafter referred to as Charles and others, severally brought suits in the circuit court of Montgomery county, Ala., against the plaintiff, who will be called hereafter the Power Company, seeking to recover damages, aggregating about $300,000, alleging that they sustained losses to that extent in consequence of this flood upon their lands and crops. The complaints are the same in form and substance, excepting, of course, the variations in the descriptions of the property alleged to have been damaged and the names of the plaintiffs and the amounts sued for. Briefly stated, it is alleged in each complaint that the Power Company had so negligently constructed or maintained its dam that by reason thereof, and as a proximate consequence, on August 7, 1917, the dam, or a part thereof, broke or gave way, and that as a further proximate result large quantities of water were caused to flow upon plaintiffs' (in the state court) lands, and caused the damage for which a recovery is

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sought. Such of these suits as were removable were removed into this court, and are now pending on the law side of the docket, and those not removable (on account of the amount claimed being less than $3,-000) are still pending in the state court.

In this situation the Power Company filed this bill in the nature of a bill of peace in this court against the several plaintiffs at law. It is alleged in the bill, among other things, that by long-continued use the Power Company had acquired a prescriptive right and easement to maintain and operate its said plant and dam and to utilize the waters of said river in operating its hydro-electric plant; that the effect of the numerous suits instituted and others threatened and likely to be brought, as the result of an alleged conspiracy or combination to foment litigation, was, in reality, a denial of and an attack upon the right of the Power Company to use and operate its property, and to appropriate the flow of the river at its dam. The bill seeks to have this right declared and quieted; and, further, it is alleged that without this relief the plaintiff will be repeatedly harassed by useless, wrongful, and vexatious litigation, and that its property rights, business, and credit will be seriously and injuriously affected, and the discharge of its duties to the public hampered and embarrassed.

It is also alleged in the bill that said suits at law are numerous, and that in each case the questions of law and fact are identical; that each of the plaintiffs, and also the defendants therein, had a common interest in the subject-matter of the litigation and in the questions of law and fact involved in these actions at law.

The Power Company, the plaintiff here, denies the averments of fact contained in the several complaints at law, and denies that it was guilty of any negligence, or that it had committed any wrong, or violated any duty that it owed to the plaintiffs in such suits in the circuit court, for or on account of the matters and things therein alleged, and asserts that it has a full and complete defense to the said several suits at law.

Further, the Power Company submits itself to the jurisdiction of the court and prays to restrain the prosecution of the various suits at law now pending in this court by removal, and those pending in the state court, and that the matters and things therein involved be determined in this court.

Other reasons are alleged for equitable intervention, which in the view taken of the case are not necessary to be now mentioned.

The defendants (plaintiffs in the state court) appeared and answered, admitting many of the material averments of the bill, including the right and easement alleged to have been acquired by the Power Company in the use and operation of its dam, etc., but asserted that the damages sought to be recovered in the actions at law were due, not to the negligent operation of the dam, but to the negligent maintenance, on the crest of the dam, of flashboards, which they declared had been improperly and defectively constructed and were allowed to collapse suddenly, releasing large quantities of water upon the lands and crops of Charles and others, with the consequent damage.

The Power Company then amended its bill, denied the negligence charged in the answer, and denied that the alleged damage was in any way attributable to the use of the flashboards. The bill as amended and

the original answer of the defendants were verified; but the defendants failed to verify their answer to the amended bill. Afterwards, during the absence of the writer by proper designation on official business in another district, the plaintiff gave due notice to the defendants, and applied to Judge Grubb, of the Northern district of Alabama, for an injunction pendente lite to restrain the further prosecution of the suits at law in accordance with the prayer of the bill, to the end that the matters therein involved might be litigated in this court. Judge Grubb held that the bill contained equity and granted the writ. It may be said, notwithstanding the defendants have challenged the equity of the bill, that from the evidence in the record it is not too much to observe that the writ was not granted with their expressed assent, but apparently with their acquiescence.

[1] At the outset of the trial before me, however, the attorneys have argued the motion to dismiss the bill for want of equity, and said motion has been considered.

The alleged conspiracy against the plaintiff here is elaborately set out in paragraph 9 of the bill, but consideration of such matters may be pretermitted, for it appears to me that the bill presents a case for equity cognizance, in that it is to enjoin a multiplicity of suits at law, where the plaintiffs at law are united by a common tie created by identity of interest in the decision of the same questions of law and fact, the party defendant is the common adversary, and the suits are so numerous that their further prosecution would visit great inconvenience, hardship, and expense upon the Power Company, defendant in the actions at law. Moreover, such suits at law are in effect a denial of the right of the Power Company to maintain and operate its dam and plant.

There are a contrariety of decisions as to the power of a court of equity to enjoin a multiplicity of actions at law, but it seems that on principle, and in the light of and in harmony with the weight of modern authority, the bill must be sustained. Pomeroy's Eq. Jurisprudence (14th Ed.) § 269, p. 500. Beginning with section 243 of this work, the author reviews the entire subject. In the instant case there are about 130 persons who have sued on their separate and individual claims against the same defendant. All these claims arise from the same common cause, are governed by the same legal rules, involve substantially the same facts, and can be settled in a single suit wherein all the plaintiff persons are made parties to one side of the controversy and the Power Company is made the other party, and where the rights of all may be adjudicated and determined. This, I think, is a fair adaption to the present case of the idea expressed by Pomeroy and quoted with approval by Justice Harlan in Osborne v. Wisconsin Central R. Co. (C. C.) 43 Fed. 825. Here it is undoubtedly true that "the plaintiffs are united by a common tie, created by identity of interest in the decision of the same questions of law and of fact, and have a common adversary." Equity discountenances the multiplicity of suits; and certainly this is true, where as in the instant case, all questions—that is, right of easement and charge of negligence, etc.—can be settled in one suit. That is one of the grounds of this jurisdiction, and aims by restraining a multiplicity of suits to give to the owner of the property the beneficial enjoyment of it and to enable him to get the benefit of

its ownership, rather than fritter it away in many and diverse suits. Hyman v. Wheeler (C. C.) 33 Fed. 629.

In the oral argument on the motion to dismiss the bill for want of equity, the attorneys for Charles and others, the defendants here, insisted that the plaintiffs in the law actions had no more than a mere community of interest, as distinguished from a common right, and that this was not sufficient to confer equity jurisdiction. But I think it may be said that, while the Power Company could make its defense in each of the law cases, this is not a sufficient reason to shut it out of a court of equity, unless the Power Company's right of defense in the law court is adequate, considering all the circumstances of the case.

In Boyce v. Grundy, 3 Pet. 210, loc. cit. 215 (7 L. Ed. 655), the court held that "it is not enough that there is a remedy at law," unless indeed the remedy there is "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." And in Cruickshank v. Bidwell, 176 U. S. 73, loc. cit. 81, 20 Sup. Ct. 280, 283 (44 L. Ed. 377), it is said: "Inadequacy of remedy at law exists where the case made demands preventive relief, as, for instance, the prevention of multiplicity of suits. * * *" Here the defense in one of the separate actions at law with a single claimant would determine nothing beyond the respective rights of the parties in that particular case as against each other; and such a contest with each of the 130 claimants might lead to interminable litigation. The theory upon which the bill is filed in this case is that equity can put at rest the controversy and determine the extent of the rights of the claimants of distinct interests in a common subject, and I think the bill should be sustained, for it appears to be essentially one for peace, and certainly, if it should be found that the Power Company is liable at all, then the claim of each of the persons, plaintiffs at law, can be fairly and fully considered, and, if need be, the amount of damages to be awarded in any case might, in the discretion of the court, be submitted to a jury.

Manifestly, the Power Company, if it defends at all, will defend upon the ground that no negligence on its part caused the crops of Charles and others to be overflowed and destroyed; and therefore it can and must make a common defense to a cause common to all the plaintiffs in the action at law, having a separate interest in a common subject-matter. As was said in the case of Hale v. Allison, 188 U. S. 56, 77, 23 Sup. Ct. 244, 252 (47 L. Ed. 380):

"Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits, and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested, and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, * * * and will not unreasonably overlook or obstruct the material interests of any."

The following cases are instructive and pertinent: L. & N. R. R. Co. v. Smith, 128 Fed. 1, 63 C. C. A. 1; Sharon v. Tucker, 144 U. S.

533, 12 Sup. Ct. 720, 36 L. Ed. 532; Hale v. Allison, supra; I. C. C. R. Co. v. Garrison, 81 Misc. 257, 32 South. 996, 95 Am. St. Rep. 469; Cumberland Tel. & T. Co. v. Williamson, 101 Miss. 1, 57 South. 559; Church v. Swetland et al., 233 Fed. 891, 147 C. C. A. 565; Home Ins. Co. of N. Y. v. Va.-Car. Chemical Co. (C. C.) 109 Fed. 861, affirmed (C. C. A. 4) 113 Fed. 1, 51 C. C. A. 21.

On the trial of the case the court overruled the motion to dismiss for want of equity, and then proceeded to hear the case on its merits. The testimony of about 75 witnesses was taken, and the court also received in evidence certain documents, maps, photographs, etc. In the decree which will be entered in the case, the motion to dismiss for want of equity will be more formally overruled.

Coming, now, to a consideration of the question of liability vel non of the Power Company in the suits at law, it will be seen that each complaint contains three counts. In the first count it is alleged that during the month of August, 1917, large quantities of water were negligently caused by the Power Company to flow or be upon the lands of the plaintiffs, and, as a proximate consequence, plaintiffs' crops were damaged, etc.; in the second, it is alleged that the Power Company's agent or servant, while acting within the scope of his employment, with reckless indifference to consequences, willfully or wantonly caused the water to flow or be upon plaintiffs' lands, being conscious at the time that his conduct would probably result in the damage complained of; and in the third it is alleged that the Power Company operated or maintained a dam across the Tallapoosa river at or near Tallassee, Ala., and that said dam was so negligently constructed or maintained that by reason thereof, and as a proximate result, on August 7, 1917, said dam, or a part thereof, broke or gave way, and as a proximate result large quantities of water were caused to flow and be upon plaintiffs' lands, destroying their crops, etc. Charles and others, the plaintiffs in the law actions, really rest their right of recovery upon the negligent operation of, or the use of, flashboards on the top of the Power Company's dam.

The testimony, taken orally in the presence of the court and reported, is voluminous. A large number of official records, maps, photographs, blueprints, engineering and climatological data, and the like, were put in evidence. Much testimony came from engineers of large experience in hydraulic work, and who were esteemed for their learning, skill, and character. Considerable testimony of a technical and scientific nature was adduced, and it tended to simplify the questions involved; but, after all, the relevant and material testimony was practically without dispute.

The Power Company's dam is of masonry, and is about 40 feet high and about 620 feet long, about 53 feet of which length is 15 inches higher than the remainder of the dam. The Power Company, by condemnation and the purchase of the flood rights above its dam, acquired the right to construct its dam 50 feet in height. It had in use, on the top of the dam, in August, 1917, and for several years immediately prior thereto, pin type flashboards. These were constructed of ordinary commercial iron piping 2½ inches in diameter and 5 feet long,

let into sockets 15 inches deep, 2 feet apart, on the crest of the dam. In front of these pins were placed ordinary boards or planks, tongued and grooved together, 3 feet high, and fastened to the pins or piping with malleable wire.

The prime purpose of the flashboards was to take care of the fluctuations in the flow of the stream; that is, to impound storage water for use in the case of natural low stage of the river, so as to maintain an effective head on, or force upon, the wheels of the machinery turned by the water and used in the operation of the plant; and the other idea of the flashboards was to release the impounded water in advance of the crest of the flood in case of an unusual rise of the stream. These boards were intended to operate automatically—that is, to overturn, break down, or give way in sections periodically—by reason of the natural force or pressure of the water and other contributing agencies, such as the impact of floating timber, so that thereby the water impounded above the dam would be gradually released. Some of the engineers denominated the flashboards a regulating device.

The preponderance of evidence shows that flashboards of this type are in common use by operators of hydraulic plants in different parts of the United States, and that their use is generally regarded as good engineering; that such regulating device is considered necessary on the crest of all dams, like the one here, regardless of the height of the masonry; and that such flashboards are especially adapted to rivers having the characteristics of the Tallapoosa. This stream has its origin in Paulding county, Ga., and flows generally in a southwesterly direction, finally emptying its waters, with accretions from numerous tributaries, creeks, and many branches, into the Gulf of Mexico. The Tallapoosa and Little Tallapoosa have their junction in Randolph county, Ala., and from there the Tallapoosa river runs into Elmore county, and, beginning at its confluence with the Coosa river, considerably larger, forms the Alabama river. The character of the country at the headwaters of the Tallapoosa, and, as a rule, down to the near neighborhood of the Power Company's dam, is largely hilly and rocky, embracing much cut over land, and many farms on the hillsides and in small valleys. The nature of this section, the topography of the land, and the like, causes the water to run off very rapidly in case of heavy rainfall, especially where the precipitation is of short duration. The country below Milstead, about 7 miles below the Power Company's dam, through which the river runs, has much lowland, generally of an alluvial nature. Broadly speaking, this is true of all the lands contiguous to the stream from Milstead to where it becomes a part of the Alabama river, and even from there all the way of its tortuous course to the Gulf.

About 3 miles below the Power Company's dam there is located on the Tallapoosa river the dam of the Tallassee Falls Company, about 1,500 feet long and 60 feet high. The bed of the river between the two dams contains much rock, many shoals, and a number of small islands, here and there, all of which, together with the two dams, have a natural tendency to retard the flow of the stream. The farms of Charles and others are located on the Tallapoosa and Alabama rivers,

and range, with one exception, from 14 to 86 miles below the Power Company's dam.

On August 5 and 6, 1917, a torrential rainstorm occurred in the upper regions of the Tallapoosa river. It was shown by the undisputed testimony of 30 or more disinterested witnesses residing in that territory that this rainfall was unparalleled in its intensity, and that, while the fall was somewhat limited in area and of only a few hours duration, it was the heaviest and most violent downpour which had occurred in their memory, with the exception of the flood of 1886. From that testimony it appears to have been the only storm of such proportions that had occurred during the crop season since the first rain gauge station was established at Milstead in the year 1897.

From the testimony of these witnesses, the records of the United States Geological Survey, the Weather Bureau, and other data, this rainfall seems to have approximated 10 inches in a comparatively short period of time, and from the United States Geological Report for the month of August, 1917, the precipitation in that locality for that month seems to have been greater than in any other locality in the United States. During this storm large trees were uprooted, dams and bridges, before that undisturbed for years, were washed away, and great damage done to crops. The river gauge, as shown by the United States Geological Survey at Sturdevant, on this river, about 20 miles above the Power Company's dam, shows that this flood produced a maximum rise of over 22 feet, with a rise of 19 feet in 17 hours. The maximum stream flow at that point approximated 57,600 cubic feet per second. At the Power Company's dam the flood reached its maximum of 10.1 feet at 10 o'clock on the morning of August 7, 1917, and the flow of the river at that time approximated 64,000 cubic feet per second. At Milstead, the stream being confined to a narrower channel, the maximum gauge on the night of August 7 was 46 feet, and the stream flow was approximately 65,000 cubic feet per second—thus reasonably accounting for the rainfall in the upper reaches of the river, the slight difference being caused by the water entering the river from intervening tributaries.

During these floods the lands and crops of Charles and others were overflowed, and some to the depth of 15 to 20 feet, and hundreds of square miles of territory were inundated. The average width of the waters below Milstead, covering a distance of about 75 miles in length, was 1½ miles.

[2-4] The insistence of Charles and others, as before stated, is that the Power Company was guilty of negligence in the maintenance of the flashboards; that they simultaneously, or nearly so, collapsed, releasing a large quantity of water, which flooded their lands, and they claim that this would not have happened, had it not been for the use of the flashboards. The evidence does not sustain this contention.

To entitle Charles and others to a recovery, it must, of course, be shown that the Power Company was guilty of negligence which proximately caused the injuries complained of. Milwaukee, etc., R. Co. v. Kellog, 94 U. S. 469, 475, 24 L. Ed. 256; Sloss-Sheffield Co. v. Wilson, 183 Ala. 411, 62 South. 802. The burden of showing that the

Power Company was guilty of actionable negligence in erecting or maintaining flashboards, and that such negligence proximately caused the injury—that is, the flooding of the plaintiffs' lands, and the consequent damage complained of—has not been discharged by Charles and others.

After careful consideration of all the testimony, I am of opinion, and so find the fact to be, that the unusual and exceedingly heavy rain which occurred on August 5 and 6, 1917, was sufficient to produce the same consequences, independent of all other causes, and that the same result would have happened, regardless of the use of the flashboards. The quantity of water impounded by the 3-foot flashboards, about 2,725 acre feet, is too inconsequential in comparison with the total excess flow of the stream. It seems, from the testimony, that the equivalent of the water stored by these boards was flowing into the pond every 30 minutes, and, conceding that the boards collapsed simultaneously, the released water would have had no appreciable effect upon the territory below the dam. I may say, however, that the flashboards, according to the preponderance of the evidence, did not collapse simultaneously. They began to go out on the afternoon of August 6, when the river had reached a stage of about 7 or 8 feet, and they went out automatically, in sections of 8 or 12 feet in length, until dark, when some 8 or 10 sections had gone out. All of the flashboards had gone out by daylight of the next morning. The operator of the plant testified that the flashboards went out as they ordinarily did, and that they had all gone out by 1 or 2 o'clock a. m. on August 7, 1917; the water being then naturally released, or unobstructed in its flow so far as the flashboards were concerned.

The river below the Power Company's dam continued to rise, reaching a maximum stage on August 7 of 10.1 feet at 10 o'clock of that day —some 10 or more hours after the collapse of the boards, and after the water impounded by them had passed the dam. Moreover, the pregnant and indisputable fact remains, as it is shown by the testimony of some of the oldest residents of that region, and as it is commonly known, that this river has overflowed frequently, and that the lands in question have been flooded to practically the same extent year after year from a period long before the erection of the Power Company's dam to the present time, although these floods rarely occurred during the crop growing season. It is also significant that, the river having reached about the same stage in December, 1918, and in February and March, 1919, which it attained in August, 1917, the land was flooded practically to the same extent at these times as it was flooded on August 6 and 7, 1917. During December, 1918, and January and March, 1919, there were no flashboards on the dam of the Power Company. If the plaintiffs in the law actions had succeeded in establishing negligence on the part of the Power Company, it would be impossible to trace the damages complained of to that negligence with any reasonable degree of certainty. In addition to the enormous volume of water flowing down the river from its upper reaches, there were contributions made to the volume by the flow of a considerable number of tributary streams below the Power Company's dam. The river itself and these streams

drained an area of thousands of square miles. It would have been impossible to measure the effect of such a relatively small volume of water impounded by the flashboards on the lands of Charles and others below the Power Company's dam.

In Western Railway Co. v. Mutch, 97 Ala. 194, 11 South. 894, 21 L. R. A. 316, 38 Am. St. Rep. 179, it is said:

"To constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered, but the connection must be by natural and unbroken sequence—without intervening, efficient causes—so that, but for the negligence of the defendant, the injury would not have occurred. It must not only be a cause, but it must be the proximate—that is, the direct and immediate—efficient cause of the injury."

This terse and clear statement of Chief Justice Stone asserts the settled law. Weatherly v. Nashville, etc., Ry. Co., 166 Ala. 575, 51 South. 959; Southern Ry. v. Crawford, 164 Ala. 178, 51 South. 340; Tobler v. Pioneer Co., 166 Ala. 482, 52 South. 86; Cooley on Torts, 70. The recent case of Georgia Railway & Power Co. v. Johns, 20 Ga. App. 780, 93 S. E. 521, seems to be in its facts and essential features like the case now under consideration, and there the decision is the same as in this case.

From what has been said, it follows that the plaintiffs in the suits at law are not entitled to recover; and that the further prosecution of such suits in this court, and in the circuit court of Montgomery county, should be perpetually enjoined.

A judgment and order in harmony with the foregoing opinion and findings will be entered.