## 8077.  GEORGIA RAILWAY AND POWER COMPANY *v.* JOHNS.

The evidence did not authorize a recovery of damages on account of the flooding of the plaintiff's farm, alleged to have been caused by water from the defendant's dams.

DECIDED SEPTEMBER 13, 1917.

Action for damages; from Stephens superior court—Judge J. B. Jones. June 10, 1916.

*Colquitt & Conyers, Claude Bond,* for plaintiff in error.

*W. A. Charters, Fermor Barrett,* contra.

LUKE, J. The plaintiff's petition makes the following case: The defendant company owns and operates a hydro-electric generating

plant on Tallulah river. Four miles below this plant the Tallulah
and Chattooga rivers unite and form the Tugaloo. Four miles
down the Tugaloo, eight miles from the defendant's plant, the
plaintiff owns and operates a farm, bordering on the river banks.
The company maintains a dam about 100 feet high and about 500
feet long across Tallulah river, where the electric plant is located,
which dam forms a storage basin for water, averaging 50 feet deep,
400 yards wide, and three miles long. Eight miles above the plant
and across the same river the company has erected another dam
of substantially the same dimensions and for the same purpose, but
which forms a much larger basin. On October 14 and 15, 1914,
heavy rains fell in that community, all the streams were swollen,
the plaintiff's farm was overflowed and his crops, of the value of
$1,500, destroyed. That part of the petition designed to show
specifically wherein the defendant is liable for the plaintiff's losses
proceeds as follows: "9. The company obstructed the natural
flow of the waters of Tallulah river on said date above the farm
of petitioner by holding in its dams aforesaid the water collected
in said Tallulah river by reason of said rainfall, and collected,
stored, and held said waters until about noon of October 15, 1914.
10. The rainfall had been large, and from noon to three o'clock
p. m., October 15, 1914, the river passing the farm of petitioner
was filling from the waters of Chattooga river and other streams
flowing into Tallulah river below the plant of the company, and
into Tugaloo river above the farm of petitioner. 11. About noon,
October 15, 1914, the company released from its dams an immense
volume of water which it had obstructed in said river, and stored
from the rains of the 12 hours previous, and this vast quantity of
water rushed down the precipitous Tallulah falls along Tallulah
river, and, reaching Tugaloo river, already swollen, quickly over-
flowed its banks, and the waters of Tugaloo, by reason of this ob-
structed and stored water suddenly turned loose, overflowed the
crops of petitioner," and thereby caused the injuries specifically
set forth.

The brief of the evidence covers 92 pages, approximately 35,000
words, and embraces the testimony of 24 witnesses. Its nature
needs to be indicated here, however, only as to those particulars
wherein it is insufficient to prove the plaintiff's case as laid in his
petition, or to support the verdict for $250 which the jury re-

turned in his favor. The plaintiff had operated his farm for 15 years, but the evidence is silent as to how long the company had maintained its dams. The dimensions of the dam at the company's plant were substantially as alleged in the plaintiff's petition, except that along the top of the cement dam there was a line of flash-boards, containing a series of gates 6 feet high and 25 feet long and virtually increasing the height of the dam 6 feet if the gates remained closed, but not so if they were opened, because water in the basin could not flow over the top of the cement dam until it had also risen above the top of the closed gates or passed through the open gates. Six of these gates were automatic, the others stationary; that is to say, six of them were so constructed as to be opened by the pressure of high water against them, and to be closed by their own mechanism upon such pressure being removed. They were also designed to open with varying degrees of pressure, or heights of water in the basin, so that all would not open at once, and, after one or more had opened, the others would not open at all unless the surface of the water in the basin continued to rise in spite of the increased flow allowed by the open gate or gates. All the gates were of modern and improved designs. On the day of the plaintiff's loss only five of these gates worked automatically, the other being out of order and remaining stationary. The company's other dam, known as the Mathis dam, 8 miles up-stream from the dam above described, was constructed on a somewhat different plan. The Mathis dam had no gates on top, but had two open sluice gates at the bottom, in the bed of the river, and other sluice gates higher up in and through the cement dam, the two open gates at the bottom being more than ample to allow the passage of the river's normal flow. Aside from the maintenance and construction of these dams, which were necessary to the operation of the business, the company did nothing either to cause or to prevent the injuries for which the plaintiff sues.

As to the volume and duration of the rainfall on the dates in question, the witnesses do not agree; but these apparent conflicts are easily reconciled by reason of the fact that the different witnesses testify as to different times and places, some of the places being several miles apart. All the witnesses, however, do agree upon the one important fact that there was an unusually heavy rainfall, covering all of the watersheds of the Tallulah and the

Chattooga rivers on the night of October 14, and on the morning of October 15, the latter being the date of the plaintiff's injuries. As to the physical facts in point relating directly to the dams and the water behind them, there is no material conflict in the evidence. At 7 o'clock in the morning of October 15 the water stood approximately three feet below the top of the cement part of the dam at the company's plant, nine feet below the top of the flash-boards; by noon it had risen sufficiently to open one of the automatic gates; during the next hour it had risen sufficiently to open the other four automatic gates that were then in good order; and, an hour or so later, it was not only pouring through the five open gates, but was also flowing over the top of all the stationary gates, including the so-called automatic gate that failed to open. It was five o'clock p. m. before the water in this basin ceased to rise, the inflow from heavy rains up-stream being greater in volume than the outpour through and over the gates. At the Mathis dam, where the bottom sluice gates were open, allowing more than a normal flow of the stream, and having no effect whatever on the stream except to partially check the flood, the water in the basin increased from a depth of three to a depth of thirty feet during the same day. The plaintiff testified, that about 2 o'clock p. m., October 15, he observed the waters of the Tugaloo overflowing its banks where that river passed his farm; that the water continued to rise so fast that before darkness came his farm was overflowed to a depth of 15 feet on the lowest lands; that the water rose from about 2 p. m. to about sunset at a rate between two and three feet to the hour; that he had many times seen the Tugaloo overflow its banks, both before and since the construction of the company's dams, but he had never before seen the water rise with such rapidity, or apparently come in waves or cease for a while and then commence to rise again as it did on this occasion, though on other occasions he had seen it rise to a depth of 15 or 20 feet over the low places on the same farm. The normal depth of the river by his farm was from one to three feet, the width of the river-bed 75 yards, and the width of his overflowed bottom lands about a half mile. Other parts of the record material to an understanding of the case will appear in the opinion.

Under the evidence, the jury were not authorized to find that the proximate cause of the plaintiff's injuries was the conduct of

the defendant as set out in the petition. Nor were they authorized to find that any wrongful act of omission or commission on the part of the defendant was the proximate cause of such injuries. In the first place, from the evidence before us, it is impossible to say, or to estimate with any degree of certainty, what proportion of the plaintiff's injuries was caused proximately and directly by the swollen waters of the Chattooga river, or by the turbulent tributaries which empty into the Tallulah below the dam in question, or even by the Tugaloo's own tributaries that rushed into the flood above the plaintiff's farm, or by any of the waters passing the defendant's dams. Necessarily all of these waters, including that which poured over and through the gates on the defendant's dam, had united to form the damaging flood before any of them reached the plaintiff's farm. But can it be said that the same flood would not have destroyed the same crops had the dams never been constructed? If so, why? The plaintiff himself testifies that before the Tallulah was dammed, substantially similar floods did come, upon the same farm, from the same streams, following like downpours of rain. But be that as it may, the sole effect of the cement part of the dam, as shown by the evidence, was to withhold permanently from the lower stream and from the plaintiff's farm a volume of water equal to at least a three-foot depth over the entire basin behind the dam. What the cement part of the dam checked it permanently held; thereby to that extent positively reducing the volume of the water below and diminishing what otherwise would have been the height of the flood at the plaintiff's farm. The only water shown by the evidence to have been checked in its natural course and to have been thereafter allowed to pass on with the flood is that which was held for a short while only by the flash-boards above the top of the cement dam, and which then passed through the open gates, even this being due to an unusual rainfall, rather than to the conduct of the defendant. What water passed over the closed gates because of the great inflow from heavy rains above the dam and in spite of five open gates, together with what in its natural course would have passed over if five of the gates had not been open, is not in any sense chargeable to the defendant company, but stands upon the same footing as the waters of the Chattooga, the tributaries of the Tallulah below the dam, and of the Tugaloo above the plaintiff's farm. As for the Mathis

dam, there is no evidence that it had any effect upon the situation other than to check and keep checking the excessive flow of Tallulah's swollen stream at that point, holding it to a steadier and more nearly normal flow than it otherwise would have had. The evidence concentrates upon the other dam. But, taking all of the evidence with reference to both dams, it is impossible to say on which side their influence was the greater, whether in increasing or in decreasing the depth of the overflow that destroyed the plaintiff's crops. Let us grant, however, what the evidence does not show, and say, for the sake of the argument, that the total effect of the two dams was to increase slightly the depth of the overflow on the plaintiff's farm. Does it follow that the plaintiff's damage would have been any less if the depth of that overflow had been 14 feet, or only 12 or 13 feet, instead of approximately 15 feet, as the evidence shows that it actually was? We think the difference would be a trifle, if any; and certainly there is no evidence in the record to show that such a difference in the depth of the overflow might have made a material difference in the extent of the damage done. For these reasons, it must be held that neither the defendant's conduct nor its property, nor both together, constituted the proximate cause of the plaintiff's injuries.

While the judgment denying the motion for a new trial must be reversed for the reasons pointed out, yet it should not be amiss to point out also what appears to be a material variance between the theory of the case laid in the petition and the theory of the case sought to be shown by the evidence. In the petition there is no intimation that the defendant was guilty of any faulty construction, improper maintenance, or negligent operation of its dams in the regular course of its business. The wrongful act charged in the plaintiff's petition is a positive and deliberate misuse by the defendant of its property, to the plaintiff's injury; the allegations of inducement and charge being, respectively, (1) that the company maintained two dams across Tallulah river, thereby obstructing the natural flow of the river, collecting and holding two large volumes of water, one dam holding a volume 50 feet deep, 400 yards wide and three miles long, the other a volume 50 feet deep, a half-mile wide and 8 miles long; and (2) that having so collected and stored said water, the defendant suddenly "released" and "turned loose" these immense volumes of water upon the

plaintiff's property, etc. Such is the petition, though not one word of evidence was offered by the plaintiff to establish his charge that the defendant had *misused* its property, either wilfully or from lack of due care. On the contrary, the plaintiff contented himself by showing merely that the defendant had previously installed a certain mechanical device, designed to work automatically and prevent the accumulation of water beyond a fixed depth, and that on the occasion in question this machine worked merely as it was designed to work. Such evidence does not establish the charge in the petition. Until the impropriety of such a use of such a device is alleged and proved, the other evidence touching it does not establish anything against the person so using it. Moreover, from the uncontradicted evidence in behalf of the defendant, it appears that the automatic gates were of an improved and modern design, their advantage over older designs being that they released an excessive inflow of water more gradually and in less bulk than did the older designs; and it further appears, from all the evidence, that on the occasion in question the dam, the flashboards, and the automatic gates merely performed the function for which they were designed, performing it substantially, if not precisely, in the manner in which they were designed to perform it in such a situation.

The plaintiff's losses, therefore, were not chargeable to the defendant, and the plaintiff was not, under any view of the case, entitled to a verdict in his favor, and the defendant's motion for a new trial should have been sustained.

*Judgment reversed. Wade, C. J., and George J., concur.*