## INLAND POWER & LIGHT CO. v. GRIEGER et al.*

### No. 8130.

Circuit Court of Appeals, Ninth Circuit.

July 16, 1937.

*Rehearing denied Sept. 24, 1937.

812

Ellis & Evans, Overton G. Ellis, and Robert E. Evans, all of Tacoma, Wash., Laing & Gray, John A. Laing and Henry S. Gray, all of Portland, Or., for appellant.

Wm. P. Lord, Gross & Anderson, Harry L. Gross, and Ben Anderson, all of Portland, Or., for appellees.

Before DENMAN, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

In an action brought by appellees to recover damages for injury to their land caused by overflowing river water, which injury was asserted to be the result of appellant's negligence, judgment was rendered in favor of appellees, from which appellants have perfected this appeal.

Appellee Fay Grieger purchased approximately 101 acres of land in Clark county, Wash., in November, 1920. Upon this land since that time, appellees have maintained a dairying business. The property is located at a bend in the Lewis river. The soil was silty loam, which, the testimony shows, "is the finest matter that floats, you might call it, the top in running stream; it is light."

The Lewis river drains an area of about 750 square miles above a point called Ariel. Included in this area are some mountain peaks. The average flow of the river from 1924 to 1933 was 4,370 second feet. The earliest stream flow records kept by the U.S. Geological survey begin in February, 1911.

In 1921, one Griswold, a civil engineer located a position at Ariel on the Lewis river for the construction of a dam, which point was about 4 miles above the location of appellee's land. From that time until 1929, he investigated the conditions of the river to determine "what had been the historical peak flood of the river." His investigation consisted of examining records of the U.S. Geological survey, log drifts and high-water marks, and talking with settlers in the valley. He ascertained that the peak of the largest flood known and recorded occurred in December, 1917. The peak of that flood was 60,000 second feet, measured at Amboy, a point on the river above the dam location. The flow of the river at the dam location exceeds the flow at Amboy by about 10 per cent. Computing the flow at the dam-site on that basis, the largest peak flow would be approximately 66,000 feet.

Construction of the dam began about November, 1929. When it was completed, the top of the dam was 240 feet above mean sea level. The elevation of the bed of the river at this point is 50 feet. A power house is located at the base of the dam, and the center of the intake is at elevation 60. The intake is 15 feet in diameter. When the machine, which is fed by the intake, is fully loaded, the capacity of the intake is approximately 3,000 second feet. On one side of the dam are located five flood gates. Together these gates have a spillage capacity of approximately 130,000 second feet, which is about twice the peak flow of the water in prior years. The gates are used to maintain the proper level of the impounded waters.

On the dam is located a gauging station, which records automatically the height of the impounded waters. A float in a stilling well is connected by a tape to a cylinder, on which is placed paper. If the float descends or ascends, the cylinder is rotated. A pencil records on the paper the variations in the height of the water in the stilling well. Below the dam is another gauging station which is used to determine the mean daily stream flow.

High waters flooded appellee Fay Grieger's property on December 21, 1933. Appellees brought this action alleging that the damages sustained were caused by negligence of appellant. Several grounds of negligence were alleged, but we need to consider only the one urged on this appeal. That ground is that the damage was "caused by the release of impounded flood waters, released by appellant through the flood gates of appellant's dam." At the conclusion of appellee's case in chief, appellant moved for a nonsuit and excepted to the ruling of the court which denied the motion. Appellant thereupon stood upon its motion and rested its case without submission of evidence. The jury returned a verdict in favor of appellees in the sum of $4,000 upon which the judgment appealed from was entered.

Appellant contends that the evidence (1) failed to prove any actionable negligence; (2) conclusively showed that an unprecedented flood caused the damage; and (3) affirmatively showed reasonable care by appellant. There was evidence from which it could be inferred that the damage was caused by an unprecedented flood, or as otherwise expressed, an act of God, and that appellant used reasonable care. Therefore, if it does not appear that appellant was negligent, there can be no recovery. In considering the evidence, we must consider only that which is most favorable to appellees, with every inference of fact that might be drawn from it. Maryland Casualty Co. v. Jones, 279 U.S. 792, 795, 49 S.Ct. 484, 73 L.Ed. 960.

For many days prior to December 21, 1933, the rainfall in the watershed of the Lewis river had been great. As a comparison, the records of the U.S. Geological survey showed the mean flow for October, 1933, to be 5,448 feet, and showed the mean flow for November, 1933, to be 5,221 feet. For the period from December 6, 1933, to December 17, 1933, the mean flow was

shown to be 25,766 second feet. The gauging station below the dam was thereafter submerged, and the figures given by the records are estimates. The correctness of these estimates has not been questioned. A witness from the Geological survey testified as follows:

"* * * As to the means used for estimating after the clockworks break-down,— well, our maximum discharge we determine from observing the high water marks that were left by the flood, and on these other dates the discharges were determined from gate operation and from lake elevations, information which was furnished by the [appellant] Inland Power & Light Company. From my experience I would consider those estimates to be accurate. We consider them so thoroughly accurate that we prepared them for publication on a daily basis."

The records of the same department showing the mean daily height of impounded waters is also in evidence. From these records we compile the following chart showing the mean daily stream flow, and the mean daily gauge height of the impounded waters:

| Date | Mean Stream Flow [1] Second Feet | Mean Gauge Height Feet |
|---|---|---|
| December 6, 1933 | 39,100 | 235.6 |
| December 7, 1933 | 25,600 | 235.15 |
| " 8, " | 14,000 | 234.6 |
| " 9, " | 33,500 | 235.0 |
| " 10, " | 52,600 | 235.2 |
| " 11, " | 32,100 | 234.3 |
| " 12, " | 32,700 | 234.5 |
| " 13, " | 23,400 | 234.0 |
| " 14, " | 16,000 | 234.2 |
| " 15, " | 12,900 | 234.4 |
| " 16, " | 10,100 | 234.6 |
| " 17, " | 17,200 | 234.8 |
| " 18, " | 46,600 | 235.1 |
| " 19, " | 40,200 | 234.5 |
| " 20, " | 44,600 | 234.6 |
| " 21, " | 84,600 | 236.9 |
| " 22, " | 114,000 | 235.5 |
| " 23, " | 58,100 | 233.6 |

[1] Below the dam.

From this chart it can be seen that for several days prior to December 20, 1933, the waters released by appellant consisted only of the natural stream flow, because the level of the impounded waters did not decrease. On the evening of December 20, 1933, the superintendent of the dam was in the town of Woodland, situated on the banks of the Lewis river about 12 miles below the dam. After observing the flood conditions in that town and the panicky condition of the people there, he determined to raise the elevation of the impounded waters to 236 feet. The gauge height recorder graph shows that from about 4 p. m. on December 20, 1933, to 2:30 a. m. on December 21, 1933, the height of the impounded waters increased from approximately 234.5 feet to 236.8 feet. Thus the impounded waters were increased 2.3 feet in 10.5 hours.

On December 20, 1933, there was some water on the Grieger land. As to the effect of the high water, appellee Fay Grieger testified:

"* * * Prior to the 20th it was not cutting away any of my land. I did not at any time observe the current cutting away any of my land up to the 21st; I noticed it on the 22nd. * * *"

He testified on cross-examination:

"When I came out the morning of the 21st, Thursday, the water in there was maybe five or six feet deep. * * *

"* * * When I got back at noon [on December 21, 1933] the water was then fairly high across the place. * * * The place where the entire wash of my property is was not submerged from noon on the 21st; it reached that point some time Thursday night [December 21, and 22, 1933]. * * * I would not know whether it washed some on the night of the 21st. I saw a lot of the wash occurring the next day, the next morning * * * it cut practically all of the 22nd. All that day of the 22nd. When we first went down in the morning, it was a way higher than it was on the 21st, as soon as daylight that morning. * * *

"As to when the river started cutting my place—I seen it cutting Friday [December 22, 1933]. As to when it first started cutting,—Friday as far as I know. I don't know whether the cutting started at the peak of the flood on Thursday night, or a little after midnight, or not. * * *"

Witness Phillips for appellees testified that his place adjoined appellees' property, and "* * * Up to the 20th there was not any cutting of the banks of the Lewis River along the Grieger property that was noticeable to me.

"It seemed to me that the water had just started over the banks of the pasture

land and the farm land of the Grieger property on the 20th. * * * I did not notice any noticeable change until the morning of the 22nd, was the first change I noticed. It raised all night on the 21st. On the morning of the 22nd it was more like an ocean than it was like a river then. The morning of the 22nd I would say was the first I noticed the river begin to cut. The Grieger property was just washing away. * * *"

On cross-examination the witness testified:

"I don't know how late on Wednesday the 20th I was at the Grieger place. * * * Perhaps eight acres were under water [on the morning of the 20th]. * * * There is a curve in the river, a slight curve, yes. The river went through and made the wash from the jetty; it just cut off the curve. I do not recall that it had done any cutting on the 20th. I did not look to see. I did not make any close examination for cuts."

Witness Roberts, an engineer testified on cross-examination, as follows:

"Q. Isn't it your opinion that erosion would start at least by 50,000 second feet? * * * A. Yes sir, I think it would start somewhere there * * *

"Q. Erosion, however, increases with quantity of water on the slope, doesn't it? A. Yes, sir, the higher the channel the higher the velocity.

"Q. The greater the discharge, the greater the erosion? A. Yes sir.

"Q. I think we understand each other. As we progressively approach from fifty thousand upwards, there was an erosion all the way? A. I would say especially in the tortuous bend.

"Q. And this was a tortuous bend where this went through? A. Yes, sir, plenty of it.

"Q. Very subject to erosion, wasn't it? A. Yes, sir."

With this evidence in mind the information shown by the charts becomes clearer. At midnight beginning the day on December 21, 1933, the water level was 236.1 feet. The high peak shown by the graph was reached 24 hours later when the elevation reached 237.6. It is apparent that at the beginning of the morning of December 22, 1933, appellant had discharged less than the stream flow, because the level of the impounded waters increased. At the peak, four of the gates were fully open,

and the last gate was partially open. At this time the last gate was opened the remaining distance. During the next 24 hours the level of the lake dropped 4 feet to 233.6 feet, thus showing that in addition to the stream flow, appellant discharged a part of the impounded waters, and it is this action of which appellees complain.

For some time prior to the opening of the last gate to its maximum, water began to enter the powerhouse. About midnight it was determined to shut off the power, open the last gate to its maximum, and leave the powerhouse. This was done. The gates then remained unchanged until December 22, 1933, at 2 p. m. The reason for this action was by the superintendent of the dam stated to be as follows:

" * * * The reason we did not try to close the gates by hand was because under the weather conditions, the amount of rain we was having and from past experience, I did not think it was advisable. Every indication was that we may have more water. * * *"

Appellant kept a log book showing the discharge of water below the gates, and the changes of the gates. From this log book and the gauge height graph, the following table shows the elevation of the impounded waters, and the discharge of waters below the gates, at the times when changes in the gate openings were made:

| Day | | | Hour | Height of impounded Waters— Feet | Spill Second Feet |
|---|---|---|---|---|---|
| December | 21, | 1933 | 12:01 a.m. | 236.1 | 61,000 |
| " | " | " | 12:45 a.m. | 236.5 | 73,000 |
| " | " | " | 4:15 a.m. | 236.75 | 76,000 |
| " | " | " | 5:30 a.m. | 236.8 | 79,000 |
| " | " | " | 7:45 a.m. | 236.75 | 78,000 |
| " | " | " | 2:00 p.m. | 236.8 | 75,000 |
| " | " | " | 3:30 p.m. | 237. | 78,000 |
| " | " | " | 4:00 p.m. | 237.05 | 85,000 |
| " | " | " | 6:30 p.m. | 237.1 | 90,000 |
| " | " | " | 9:00 p.m. | 237.3 | 100,000 |
| " | " | " | 10:00 p.m. | 237.4 | 100,500 |
| " | " | " | 11:00 p.m. | 237.5 | 100,000 |
| December | 22, | 1933 | 12:00 | 237.6 | 105,000 |
| " | " | " | 12:16 a.m. | 237.2 | 129,000 |
| " | " | " | 2:00 p.m. | 234.9 | 112,600 |
| " | " | " | 3:00 p.m. | 234.85 | 112,600 |
| " | " | " | 8:30 p.m. | 234.05 | 101,000 |
| " | " | " | 9:00 p.m. | 234. | 101,000 |
| " | " | " | 11:00 p.m. | 233.7 | 92,700 |
| " | " | " | 1:00 a.m. | 233.5 | 92,700 |

The gauge height graph indicates that from the beginning of the morning of December 22, 1933, the elevation of the im-

pounded waters decreased 6 inches in 30 minutes. Appellees contend that the chart is correct, and that in addition to the stream flow, appellant discharged 48,400 second feet. Appellant, on the other hand, contends that due to physical factors the graph is incorrect, and proceeds to demonstrate that it was physically impossible to discharge any such amount of water. We see no reason to enter the dispute because of other evidence in the case.

Engineer Roberts testified that the increase over the natural flow on December 22d, was approximately 6 per cent., which would be about 6,800 second feet; that if water was on the Grieger land to a depth of 6 feet, this additional discharge would raise the water on the Grieger place "a little over 4 inches"; that the mean discharge of 114,000 second feet "would have sufficient force to be a competent force to cut away land, with the velocity that the stream has"; that the drop in the elevation of the impounded waters "would have some effect on Mr. Grieger's land."

From this evidence it is apparent that erosion commenced on December 21, 1933, and that such erosion was entirely caused by less than the actual stream flow, because the elevation of the impounded waters increased all that day; that erosion occurred on December 22, 1933, which erosion was caused in part by actual stream flow, and in part by the discharge of impounded waters. In other words, the erosion occurring on December 21, 1933, was wholly caused by natural conditions, and the erosion occurring on December 22, 1933, was caused by a combination of natural conditions and human agency. Since there is evidence supporting the conclusion that the discharge of impounded waters caused damage, it was for the jury to determine whether or not an ordinary, reasonable, and prudent man, under like or similar circumstances, would have taken the action followed by appellant. This is especially true in view of the evidence of the superintendent of the dam that " * * * you could run the water twenty foot over the top of that dam, and that dam would still be there. The safety factor of that dam is so far above the actual pressure of the water up to 235, that it is about 5 to 1."

For these reasons, there is no merit in appellant's contentions that the damage was the result solely of an act of God; that no negligence was proven. The Majestic, 166 U.S. 375, 386, 17 S.Ct. 597, 41 L.Ed. 1039.

Thus it is apparent that water, from natural causes, and water negligently discharged by appellant, eroded appellees' property causing damage. The two causes were concurrent. There was no evidence as to the precise amount of damage done by the negligent discharge of impounded waters alone. Appellant contends that it was incumbent on appellees to prove the portion of the damage caused by their act, and relies on Radburn v. Fir Tree Lumber Co., 83 Wash. 643, 145 P. 632, Georgia Ry. & P. Co. v. Johns, 20 Ga.App. 780, 93 S.E. 521; and Brown v. Chicago, B. & Q. R. Co. (D.C.Neb.) 195 F. 1007.

Before discussing this contention, it must be borne in mind that state decisions establishing a rule of liability for negligence are not binding on the federal courts. Tweeten v. Tacoma Ry. & Power Co. (C. C.A.9) 210 F. 828, 831, 127 C.C.A. 378.

The general rule is stated in 45 C.J. 920, § 485, as follows:

"As a general rule, it may be said that negligence, to render a person liable, need not be the sole cause of an injury. It is sufficient that his negligence, concurring with one or more efficient causes, other than plaintiff's fault, is the proximate cause of the injury. So that where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted, to as great an extent, and that such other cause is not attributable to the person injured. * * *"

One specific application is where damage is the result of two concurring causes, one of which is the negligence of defendant and the other, the negligence of a third person, "the defendant is liable to the same extent as though it had been caused by his negligence alone." Miller v. Union Pacific R. Co., 290 U.S. 227, 54 S.Ct. 172, 174, 78 L.Ed. 285, and cases cited. See, also, Grand Trunk Railway Co. v. Cummings, 106 U.S. 700, 702, 1 S.Ct. 493, 27 L.Ed. 266; Deserant v. Cerillos Coal Railroad Co., 178 U.S. 409, 420, 20 S.Ct. 967, 44 L.Ed. 1127; Gila Valley R. R. Co. v. Lyon, 203 U.S. 465, 473, 27 S.Ct. 145, 51 L.Ed. 276; Wilmington Mining Co. v. Fulton, 205 U.S. 60, 75, 27 S.Ct. 412, 51 L.Ed. 708; Kreigh v. Westinghouse & Co., 214 U.S. 249, 257, 29 S.Ct. 619, 53 L.Ed. 984; Pacific

Telephone & Telegraph Co. v. Hoffman (C.C.A. 9) 208 F. 221, 227.

■ Is there any different rule where the concurring causes of the damage are an act of God and negligence of defendant? By the overwhelming weight of authority the rule is the same. The Salton Sea Cases (C.C.A. 9) 172 F. 792, 97 C.C.A. 214; American Coal Co. v. De Wese (C.C.A. 4) 30 F.(2d) 349; Patton v. Southern Ry. Co. (C.C.A. 4) 82 F. 979, 27 C.C.A. 287; 45 C.J. 939. Compare: Eikland v. Casey (C.C.A. 9) 290 F. 880; Oregon Washington R. & N. Co. v. Williams (C.C.A. 9) 268 F. 56. In Washington this rule prevails. Howe v. West Seattle Land & Improvement Co., 21 Wash. 594, 59 P. 495; Goe v. Northern Pac. Ry. Co., 30 Wash. 654, 71 P. 182; Rice v. Puget Sound Traction, Light & Power Co., 80 Wash. 47, 141 P. 191, L.R.A.1915A, 797. If a different result was reached in Radburn v. Fir Tree Lumber Co., 83 Wash. 643, 145 P. 632, then we must consider that case to be overruled by Grant v. Libby, McNeill & Libby, 160 Wash. 138, 295 P. 139.

■ It might be argued that such a rule is a harsh one when applied to the facts in this case because you should infer that since only 6 per cent. of the waters causing the damage were negligently discharged, therefore appellant's negligence caused only 6 per cent. of the damage. To sustain such an inference you would have to conclude that the waters negligently discharged were the top 4 inches of the stream. That inference is possible, but not the only inference. It would be as reasonable to conclude that the 6 per cent. of the waters only, eroded the land because you might infer that such waters all were against the plaintiff's land. It might also be inferred that such waters were on the bottom of the stream, or so commingled with the natural flow that it would be impossible to determine whether it was the natural flow of the waters negligently discharged which caused the erosion.

■ A further question, not raised by the parties, has been raised in this court. Since it is true that the evidence shows some damage by the act of God prior to the time when appellant's negligent act concurred, was appellant liable therefor, and if not, did appellee have a duty to prove the amount of damage done by such part of the act of God? Assuming, without deciding, that appellant would not be liable for the damage caused by the act of God, and which was sustained prior to the concurrence of appellant's negligence, we believe no objection to the proof in this case can be taken. It is true that the proof does not show to a mathematical or scientific certainty the amount of damage done by the act of God prior to the time when appellant's negligence concurred. It does disclose that erosion occurred prior to that time. Where such erosion occurred, the land was covered with water to some depth. It would be impossible to abruptly stop that water, measure the damage done, and then start the flood again. The law does not require the impossible. Appellee showed the facts, carefully, and appellant offered no proof. The situation is the same as in a personal injury case where recovery is had for pain, suffering, and mental anguish. The damage here is one of the things that cannot be demonstrated mathematically by any one, and we must accept the jury's determination. The statement in Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U.S. 317, 335, 2 S.Ct. 719, 731, 27 L.Ed. 739, that "As with a blow on the face, there may be no arithmetical rule for the estimate of damages," is in point. See, also, United Verde Copper Co. v. Jordan (C.C.A. 9) 14 F.(2d) 299; United Verde Extension Mining Co. v. Jordan (C.C.A. 9) 14 F.(2d) 304; United States Smelting Co. v. Sisam (C.C.A. 8) 191 F. 293, 37 L.R.A. (N.S.) 976.

■ In fact, no such question is before us. If we assume that appellant was not liable for the erosion occurring prior to the time of appellant's negligence, we must assume that the trial court so instructed the jury. Certainly, no error is presumed. Since the instructions are not before us, we must assume that there was no error.

■ Grieger's land was damaged by entirely eroding the silt loam on a part, and by the deposit of sand and gravel over another part. One witness testified that the reasonable market value of Grieger's land before the flood was "$250.00 to $300.00 an acre," and that after the flood the land had no value.

Grieger testified that the reasonable market value of the land before the flood was $22,000 with the buildings, and that after the flood the place was not worth over $1,000 or $2,000. This evidence sustains the verdict of the jury which was $4,000.

■ The second assignment is that the trial court erred in entering judgment on the verdict, in that the verdict was against the law and unsupported by the evidence. Such an assignment presents nothing for review. Dayton Rubber Mfg. Co. v. Sabra (C.C.A. 9) 63 F.(2d) 865; Hecht v. Alfaro (C.C.A. 9) 10 F.(2d) 464, 466.

■ The third assignment is that the trial court erred in denying appellant's motion for a new trial. Such a ruling is not assignable as error. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 53 S.Ct. 252, 254, 77 L.Ed. 439; Mutual Life Ins. Co. v. Wells Fargo Bank & Union Trust Co. (C.C.A. 9) 86 F.(2d) 585.

Affirmed.

DENMAN, Circuit Judge.

I dissent. On the facts as found in the majority opinion the decision is opposed to every decision of the Supreme Court from the flood case of Memphis & C. Railroad Co. v. Reeves, 10 Wall. 176, 190, 19 L.Ed. 909, and of all the Circuits, which holds that one cannot be held liable for damage of which he is not the proximate cause.

The majority opinion finds that before any act of negligence of defendant, the flood had raged over plaintiff's lands for at least 12 hours to a depth of 4 or 5 feet. It finds "The soil was silty loam, which, the testimony shows, 'is the finest matter that floats, you might call it, the top in running stream; it is light.'" It finds that only after the land had been out of sight under the flood waters for these 12 hours, did the power company release water from its dam raising the 4 or 5 feet but a few inches. It finds that when the land emerged from the waters all its value had been destroyed.

It might well be said, res ipsa loquitur, the flood without any negligence of the power company had carried away a large, but not measurable, portion of the plaintiff's arable land. However, the majority opinion finds as a fact that the damage arising after the defendant tortiously released the added inches to the raging feet is impossible of determination.

"Since it is true that the evidence shows some damage by the act of God prior to the time when appellant's negligent act concurred, was appellant liable therefor, and if not, did appellee have a duty to prove the amount of damage done by such part of the act of God? Assuming, without deciding, that appellant would not be liable for the damage caused by the act of God, and which was sustained prior to the concurrence of appellant's negligence, we believe no objection to the proof in this case can be taken. It is true that the proof does not show to a mathematical or scientific certainty the amount of damage done by the act of God prior to the time when appellant's negligence concurred. It does disclose that erosion occurred prior to that time. Where such erosion occurred, the land was covered with water to some depth. *It would be impossible to abruptly stop that water, measure the damage done, and then start the flood again. The law does not require the impossible.*" (Italics supplied.) (Majority opinion.)

Upon this candid statement of what the record truly shows, is created a new rule of liability. It is no longer required of a plaintiff that he prove what damage to his property the defendant's tort has proximately caused. All he now has to do, in this Circuit, is to prove that it is *impossible to prove* such proximately caused damage. It is a new theory of the law that the impossibility of maintaining plaintiff's burden of proof shifts the burden to the defendant to show how much or how little his tort has damaged plaintiff.

The fact that the case comes to us from a denial of a motion for a nonsuit and without the court's instructions does not aid the appellee landowner. On the findings of fact made by this court, no instruction that the defendant "was not liable for erosion occurring prior to defendant's negligence," as suggested in the majority opinion, would cure the impossibility of determining what invisibly inflicted damage had been caused by defendant's negligence—the few inches addition to the flood after the 12 hours of the sweep of the torrent over the light silty soil.

It is but logical, in view of the above findings and decision that this court hereafter must decide that a tort-feasor is liable for damage occurring, here from the flood, *prior to his tort*. He will be so liable wherever the plaintiff shows the impossibility of a segregation of the damage prior to the concurrency of the tort and the natural forces in proximate causation of the later (and here invisibly inflicted) damage.

However, let us suppose that the damage was from another natural element—from fire instead of water, visible instead

of invisible, in its damaging progress. Suppose a fire caused by lightning burns 500 acres of plaintiff's ripe grain; suppose on the same day a neighbor tortiously starts a brush fire which burns towards the lightning fire and joins the lightning fire after the 500 segregable acres have burned. The brush fire and the lightning fire continue together through the plaintiff's grain and burn 100 acres more.

Is the tortious neighbor liable for 100 acres or for 600 acres? It is obvious that he is liable only for the 100 acres. The cases are not distinguishable because the act of nature in one works through water and in the other through fire.

A careful search fails to disclose any case holding that a tort-feasor is liable for damage not inflicted by him because a force disconnected from the tort which caused such prior damage, merges with the tort, and both inflict further damage. In none of the flood cases and others cited in the majority opinion is there any finding of unsegregable damage prior to the tort-feasor's participancy in the cause of the prior damage and jointly caused further damage. The judgment should have been reversed.