**W. M. CLEMONES and James Highfield,**
**Plaintiffs,**

v.

**ALABAMA POWER COMPANY,**
**Defendant.**

**Civ. A. No. 1538.**

United States District Court
N. D. Georgia,
Rome Division.

Jan. 11, 1966.

**434**

Parker, Clary & Kent, Rome, Ga., for plaintiffs.

Matthews, Maddox, Walton & Smith, Rome, Ga., for defendant.

1. Georgia Code Section 22–1504, provides in part:

SIDNEY O. SMITH, Jr., District Judge.

This is a removal case in which plaintiff Highfield, as a long-term tenant of certain river-bottom lands on the Coosa River, owned by plaintiff, Clemones, seeks to recover damages for flooding, which he contends was caused by the defendant Alabama Power Company, which erected in 1961 the Weiss Dam downstream on the river. By prior motion for summary judgment, the defendant has raised two questions: (1) lack of jurisdiction on the grounds that defendant is not doing business in Georgia and (2) lack of jurisdiction on the grounds that service through the Secretary of State was ineffectual. At the trial on the main issue, these two defenses were renewed.

### PRELIMINARY QUESTIONS

(1) The two jurisdictional questions were determined adversely to defendant by Judge Hooper on his denial of the motion for summary judgment. We find nothing further in the trial to change those rulings. The facts are clear that the defendant power company erected a dam in Alabama and created a reservoir over its lands in Alabama and reaching some 25 miles into Georgia. The purposes of the dam, according to defendant's engineer were to generate power, for flood control, and for recreational purposes. As a regular daily routine, power is generated at the power house in Alabama from the entire reservoir. This power is sold directly to consumers in Alabama by defendant and it sells none directly in Georgia, though it does wholesale power thus generated to the Georgia Power Company, which sells to consumers in the state of Georgia. It maintains in Georgia electronic and mechanical equipment on the banks of the reservoir which furnish information used to assist in the operation of the dam and powerhouse in Alabama. We do not believe any jurisdiction is conferred by the ownership of land.[1]

"22–1504. (2206) *Ownership of land by foreign corporation; mineral rights.—*

However, the facts recited do constitute "doing business" sufficient to meet the Georgia test. See Sterling Materials Co., Inc. v. McKinley et al., 218 Ga. 574 (2), 129 S.E.2d 770. And, this result does not contravene federal due process. McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223.

■■■■ (2) As to the service of process, the record shows that defendant was served by registered mail by the Georgia Secretary of State. Defendant's objection is that the Secretary of State was not properly "served" in that the original State petition was mailed to that official by plaintiff's counsel instead of being delivered personally by a deputy sheriff or some other officer. The state nonresident service statute provides that service may be effected "by leaving two copies of the petition * * * in the hands of the Secretary of State."[2] We

do not believe this envisions any formal service by an officer on the Secretary of State. If it does, it was effectively waived by the Secretary of State in this instance.[3] Liberalized Federal Rule 4(e) states that federal service may be effected on a nonresident "under the circumstances and in the manner prescribed in the (state) statute." Generally, the proper test is whether the defendant nonresident has received proper notice and not whether the state official has received proper notice. In other words, the effectiveness of service is tested at its terminus, and not at an intermediate way-station. See 2 Moore, Federal Practice, § 4.41. Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091. In the instant case, there is no question that the defendant received ample and proper notice from the Secretary of State. Even if defendant has the right to attack the manner of receipt by the state official, it appears that it was sufficient

Any foreign corporation claiming to own lands in this State in quantity amounting to as much as 5,000 acres, shall be incorporated by the laws of this State, or domesticated under the laws of this State or qualified under sections 22–1506 to 22–1511; and on its failing to do so, the State will not consent to the said corporation owning said lands so located in her territory. Any foreign corporation which shall thereafter claim to own land in this State in quantity amounting to 5,000 acres or upwards, shall become incorporated by the laws of this State, or domesticated under the laws of this State or qualified under sections 22–1506 to 22–1511, and in default thereof this State will not consent that said foreign corporation shall own lands in her territory; and no foreign corporation shall own more than 5,000 acres of land except upon the condition of becoming a corporation under the laws of this State, or domesticated under the laws of this State or qualified under sections 22–1506 to 22–1511:" * * *

2. Georgia Code Section 22–1508 provides: "22–1508. Same; method of service of process on Secretary of State.—If such foreign corporation, doing business in this State, and which does not maintain a place of business and agent in this State upon whom service may be perfected, shall fail to designate some person or persons who may be found and served with notice, summons, or process in this State,

then service of summons or process shall be made upon such corporation by leaving two copies of the petition or other pleading with copy of process or summons thereto attached, with a fee of $4 for each defendant. in the hands of the Secretary of the State of Georgia, and such service shall be sufficient service upon such nonresident corporation, provided that notice of such service and a copy of the petition and process is forthwith sent by registered mail by the plaintiff or the Secretary of State of Georgia, to the principal office of said corporation in the State in which such corporation was chartered or in any other State where the principal office of such corporation may be located, and the corporation's return receipt and the plaintiff's affidavit of compliance herewith are appended to the petition and summons or other process and filed with summons, petition and other papers in said case in the court wherein the action is pending."

3. The record discloses under date of December 2, 1963, letter to plaintiff's attorneys which states in part:
    "This will acknowledge service in hand as Secretary of State, copies of petition and process in the case of W. M. Clemones and James Highfield vs. Alabama Power Company, together with the $2.00 fee, for which receipt is enclosed."

under the terms of the state statute and the affirmative acknowledgment by him.

Accordingly, the court finds against these two jurisdictional defenses, and on the main issues makes the following

## FINDINGS OF FACT

Following several years study, the Alabama Power Company constructed in 1961 the Weiss dam on the Coosa River. It has five gates, three spillway and two trash. Never are all gates opened at once because of flood danger downstream.

Prior to the construction, the normal elevation of the Coosa River at the point in question was 550 feet above sea level. After the construction of the dam, the normal summer pool of the reservoir is 564 feet, or an increase of 14 feet. During the winter and spring rains, the elevation is normally lowered to 558 feet in order to pass off a reasonable amount of accumulated surface water.

The defendant owns in fee simple all the land up to elevation 564 and purchased through condemnation some 38 acres of the plaintiff's farm, principally along the old river banks and in a "slough" on the south side of the farm. On adjacent tracts, the defendant owns, through condemnation, a flowage easement up to at least 575 feet to take care of temporary flooding, but owns no flowage easement on the land in question.

Allatoona Dam, a government project, is located upstream and was placed in operation in 1948, some 13 years prior to the construction of Weiss Dam. Allatoona was primarily a flood control facility and generally it reduced the elevation or level of flooding downstream, but increased the duration.

Weiss Dam increased the elevation or level of flooding upstream and also increased the duration of the flooding. During times of heavy rains and "freshets" at the upper end of the reservoir a gradient or wave of water can exist so that the elevation in the reservoir is several feet higher than that maintained by the gates at the dam. The highest setting at Weiss Dam was 568.1 while the highest elevation of floodwater on plaintiff's land was 573 feet.

During the period covered by this suit (1961–Nov. 26, 1963), there were three flood periods for which temporary damages are sought. They are:

December 11, 1961 — December 31, 1961
January 1, 1962 — April 20, 1962
March 16, 1963 — May 15, 1963.

Prior to the Weiss Dam, the land in question was subject to frequent flooding and during the period 1938 through 1957 natural floods occurred some 22 times. At the mid-point on plaintiff's river frontage (River Mile 264) seven floods attaining elevation of 573 occurred prior to 1961, and all attained elevation of 567.

Plaintiff's farm originally consisted of some 1125 acres. Following the original condemnation, there remained 1090 acres. Of this, some 600–650 acres was in improved pasture, and some 300 acres in row crops, and the remainder in timber and farm yards. Generally, the pastures were on the lower elevations and suffered the most from flooding, while the row crops were on the higher elevations. The following total acreage is covered by water at the flood elevations shown above 567 (normal winter and spring flood stage):

| | |
|---|---|
| 568 | 47.70 acres |
| 570 | 120.80 acres |
| 571 | 181.00 acres |
| 572 | 260.70 acres |
| 573 | 355.55 acres. |

The frequency of floods has not been increased by the operation of Weiss Dam by the defendant. Floods have continued to occur when brought on by natural causes and the effect of the operation of Weiss Dam generally has been to cause the water to rise higher and stay elevated longer during flood periods than would have been experienced previously from solely natural causes.

As a direct and proximate result of the operation of Weiss Dam, plaintiff's lands were inundated a total of 2922.8 acre-days, over and above normal flooding.[4]

4. In this respect, the court accepts the testimony of D. L. McCrary, defendant's expert hydraulics engineer. After plaintiff presented a prima facie case of flooding, the defendant undertook the task of apportioning the flooding between natural causes and Weiss Dam. This was brilliantly presented by McCrary's testimony and graphic maps and charts showing the area and duration of each flood. In substance, the flooding due to Weiss Dam is illustrated by the following chart.

| ELEVATION OF BAND | ACRES IN BAND | DURATION WITHOUT WEISS | DURATION WITH WEISS | INCREASE | ACRE DAY INCREASE |
|---|---|---|---|---|---|
| 1st Flood | December, 1962 | | | | |
| 564–566 | 14.0 | 13 | 15 | 2 | 28.0 |
| 566–568 | 33.7 | 11 | 14 | 3 | 101.1 |
| 568–570 | 73.1 | 7 | 13 | 6 | 438.6 |
| 570.0–571.9 | 131.2 | 2 | 5 | 3 | 393.6 |
| 571.9–573.0 | 103.5 | 0 | 1 | 1 | 103.5 |
| | | TOTAL ACRE-DAY INCREASE | | | 1067.8 |
| 2nd Flood | January & February, 1962 | | | | |
| 564–566 | 14.0 | 7 | 9 | 2 | 28.0 |
| 566–568 | 33.7 | 4 | 7 | 3 | 101.1 |
| 568–569.8 | 62.8 | 2 | 3 | 1 | 62.8 |
| 569.8–570.6 | 44.5 | 0 | 1 | 1 | 44.5 |
| | | TOTAL ACRE-DAY INCREASE | | | 236.4 |
| 3rd Flood | February, 1962 | | | | |
| 564–565.8 | 12.3 | 1 | 8 | 7 | 86.1 |
| 565.8–567.0 | 14.7 | 0 | 2 | 2 | 39.4 |
| | | TOTAL ACRE-DAY INCREASE | | | 125.5 |
| 4th Flood | March, 1962 | | | | |
| 564–565.5 | 9 | 0 | 2.5 | 2.5 | 22.5 |
| | | TOTAL ACRE-DAY INCREASE | | | 22.5 |
| 5th Flood | April, 1962 | | | | |
| 564–566 | 14.0 | 7 | 9 | 2 | 28.0 |
| 566–568 | 33.7 | 4 | 7 | 3 | 101.1 |
| 568–570 | 73.1 | 1 | 3 | 2 | 146.2 |
| 570–570.8 | 46.8 | 0 | 1 | 1 | 46.8 |
| | | TOTAL ACRE-DAY INCREASE | | | 322.1 |
| 6th Flood | March, 1963 | | | | |
| 564–566 | 14.0 | 12 | 18 | 6 | 84.0 |
| 566–568 | 33.7 | 3 | 11 | 8 | 269.6 |
| 568–570 | 73.1 | 2 | 3 | 1 | 73.1 |
| 570–570.7 | 40.5 | 1 | 2 | 1 | 46.5 |
| 570.7–571.0 | 19.7 | 0 | 1 | 1 | 19.7 |
| | | TOTAL ACRE-DAY INCREASE | | | 492.9 |
| 7th Flood | May, 1963 | | | | |
| 564–566 | 14.0 | 6 | 9 | 3 | 62.0 |
| 566–568 | 33.7 | 4 | 7 | 3 | 101.1 |
| 568–570 | 73.1 | 2 | 6 | 4 | 292.4 |
| 570–571 | 60.2 | 1 | 3 | 2 | 120.4 |
| 571–572 | 79.7 | 0 | 1 | 1 | 79.7 |
| | | TOTAL ACRE-DAY INCREASE | | | 655.6 |

| | RECAP | |
|---|---|---|
| 1st | 12–61 | 1067.8 |
| 2nd | 1 & 2–62 | 236.4 |
| 3rd | 2–62 | 125.5 |
| 4th | 3–62 | 22.5 |
| 5th | 4–62 | 322.1 |
| 6th | 3–63 | 492.9 |
| 7th | 5–63 | 655.6 |
| | | 2922.8 |

Pastures under water are not usable until "dried out" and a reasonable dry-out period is one-half the time they are covered with water. In addition, some of the type grasses used by plaintiff in his pasture (clover, fescue, and orchard) are destroyed and must be reseeded if they remain under water for 10 to 12 days. Six months is a reasonable period for reseeding operations (during which use is denied) following a flood of such length. Thus the total acre-day loss due to Weiss is 23,608.2 [5], or 787 acre-months.

As a result of Weiss Dam, the crop damage in grasses was $2,021.70.[6]

As a result of Weiss Dam, seven acres (out of 25) of oats and rye were destroyed, with a reasonable value of $50.00 per acre, or $350.00. In addition, three acres (out of 100) of open cotton were destroyed, with a reasonable value of $150.00 per acre, or $450.00.

The plaintiff also lost seven head of cattle during one of the floods, of a reasonable value of $1,470.00 but it is impossible to determine whether such loss was due to Weiss Dam or natural causes.

The lands involved have poor natural drainage and insufficient efforts have been made by plaintiff to alleviate this problem. Also, the lands have been overgrazed for the past several years.[7] As a result the fair rental value of the pasture lands involved is not what it could be if these two factors were absent. A reasonable rental value for plaintiff's pasture is $48.00 per acre per year, or $4.00 per month.

## CONCLUSIONS OF LAW

■■ The acts and omissions of the defendant constitute a human agency and, therefore result in a trespass against the defendant even though coupled with acts of God. Here, the facts show that defendant had made a detailed study of flooding in the area prior to the construction of its facility, and the history of climatic variations and other conditions in the particular locality afforded a reasonable warning to it of their likely recurrence. Consequently, the natural events which transpired were not so extraordinary as to free defendant from all liability. Georgia Code Section 105–1407. Goble v. Louisville & N. R. Co., 187 Ga. 243, 200 S.E. 259; Sampson v. General Electric Supply Corp., 78 Ga.App. 2(3), 50 S.E.2d 169; Southern Mills, Inc. v. Newton et al., 91 Ga.App. 738, 87 S.E.2d 109.

■ As a trespasser, defendant is liable for the harm caused by it. In making such a determination, when the total harm is caused by a combination of the defendant and an act of God, the damages should be apportioned. This is, in reality, a practical problem in causation and is dependent on the evidence avail-

---

5. Actual acre-day loss     2922.80
   Plus 50% for "dry out"     1461.40
   Plus two occasions where reseeding was caused by Weiss extending the flood past 10 days

   1st Flood

   Elev. 568–570
   73.1 acres × 180 das= 13,158.00
   6th Flood

   Elev. 566–568
   33.7 acres × 180 das= 6,066.00
              19,224.00

   TOTAL ACRE-DAY LOSS    23,608.20

6. In this respect, the court accepts the testimony of Herman Frick, defendant's independent agricultural expert. He has extensive experience in farm management for the Doane Agricultural Service and is completely familiar with the grass-

es involved. He likewise had been on the farm in 1960, 1961, 1963, and 1965. His testimony was based on McCrary's computations and tied in to the actual topography as follows:

| OCCASION | GRASS DAMAGE |
|---|---|
| 1st Flood | $ 1,035.00 |
| 2nd Flood | 89.00 |
| 3rd Flood | 29.40 |
| 4th Flood | 18.00 |
| 5th Flood | 93.60 |
| 6th Flood | 39.40 |
| 7th Flood | 717.30 |
| TOTAL | $ 2,021.70 |

7. Good husbandry practices in the area allow 1¼ acres to 2 acres per cattle unit. At times, plaintiff has had as high a ratio as 1 per ¾ acre.

able in each case. "Damages for harm are to be apportioned among two or more causes where—(b) there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (2d), Torts (§ 433A [1965]) and comment (1) (e). 93 C.J.S. Waters § 38 (a). See also Norfolk & W. Ry. Co. v. McCoy, 257 Ky. 32, 77 S.W.2d 392 (almost identical on facts); McAdams v. Chicago, R. I. & P. R. Co., 200 Iowa 732, 205 N.W. 310; Pfannebecker v. Chicago, R. I. & P. R. Co., 208 Iowa 752, 226 N.W. 161. Such is the case here and it is quite unlike those cases where it is impossible to distinguish the injury from each cause. Inland Power & Light Co. v. Grieger, 91 F.2d 811, 112 A.L.R. 1075 (10); Frederick v. Union Carbide Corp., D.C., 168 F.Supp. 808, aff'd 4 Cir., 268 F.2d 499. Similarly, it is unlike those cases where no injury would have occurred "but for" the acts of the defend-ant. Restatement, Torts § 450 (1934); Pollard v. Walton, 55 Ga.App. 353 at 355, 190 S.E. 396; Southern Ry. Co. v. Lester, 33 Ga.App. 136, 125 S.E. 722.

▮▮▮ Thus, we turn to the proper apportionment of damages under the evidence in this case. Great effort was placed by counsel in proposed findings on the proper measure of damages for flooding, which normally would be the difference in market value of the freehold. Warren v. Ga. Power Co., 58 Ga.App. 9, 197 S.E. 338; cf. Towaliga Falls Power Co. v. Sims, 6 Ga.App. 749, 65 S.E. 844. However, because of the many separate acts of flooding and the various items of damage claimed in the suit, the "freehold" theory was discarded at pre-trial, and the parties stipulated to treat the damages claimed as "specifics." The pre-trial order of October 6, 1965, itself provided:

"ITEMS OF DAMAGES: Cattle — Fair market value of cattle

Crops — Fair market value of crops separately

Pasture ⎰ Fair rental value for period in which

Farm ⎱ use was denied.

Owner is entitled to nominal damages only."

---

As no exception was filed thereto, this order controlled the case thereafter. Federal Rule 16; Sinclair Ref. Co. v. Howell, 222 F.2d 637(3) (5th Cir. 1955). And this rule applies to damage questions. See Earle W. Baker & Co. v. Lagaly, 144 F.2d 344, 154 A.L.R. 1098 (10th Cir. 1944); United States v. 2,-124.67 Acres of Land, D.C., 138 F.Supp. 529.

8. Defendant is charged with the entire cattle loss because of the "impossibility" of apportionment. See Frederick v. Union Carbide Corp., 168 F.Supp. 808(3).

▮▮▮ With the case in this posture, the Court awards damages to plaintiff Highfield for rental value of pasture for the period in which his use was denied, for crop damage, and for actual cattle loss[8] in the total sum of $7,439.70.[9] Nominal damages in the sum of $15.00 are awarded plaintiff Clemones.

Let judgment issue accordingly.

It is so ordered.

9. Computed as follows:

| | | |
|---|---|---|
| Rental value | | |
| 787 mos. × 4.00 acre | $ 3,148.00 | |
| Crop damage | | |
| Grasses | 2,021.70 | |
| Cotton | 450.00 | |
| Oats and Rye | 350.00 | |
| Cattle | 1,470.00 | |
| | $7,439.70 | |